[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-14452
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 4, 2011
JOHN LEY
CLERK

D.C. Docket No. 08-00014-CR-5-RDP-PWG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SUZANNE L. SCHMITZ,
a.k.a. Suzanne Martha Lowe Schmitz,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(March 4, 2011)

Before MARTIN, COX, and BLACK, Circuit Judges.

COX, Circuit Judge.

Suzanne L. Schmitz, a former Alabama state legislator, was convicted on three counts of mail fraud, in violation of 18 U.S.C. § 1341, and four counts of theft

concerning a program receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A)). The theory of prosecution underlying all the charges was that Schmitz abused her position as state legislator to obtain employment with the Community Intensive Treatment for Youth Program (the "CITY Program" or "Program"), a federally-funded program for at-risk youth, and then collected over $177,000 in salary and other benefits from the Program, even though she performed little or no work, generated virtually no services or work product, and rarely showed up at Program offices. To conceal her scheme, Schmitz obtained a flexible work schedule and submitted false and fraudulent statements regarding the number of hours she worked and the volume and nature of her services.

Schmitz now appeals, challenging her convictions on various grounds. Because we conclude that the federal-funds counts of the indictment did not sufficiently allege a scheme to defraud, we vacate Schmitz's convictions on those counts. We affirm Schmitz's convictions for mail fraud. And, we vacate her sentences and remand for resentencing.

## I.  BACKGROUND

## A.  FACTS

### 1.  Schmitz's path to the CITY Program

Alabama voters elected Schmitz to the state legislature in 1998, and re-elected her in 2002.[1]  Schmitz's legislative duties required her to be in Montgomery three days a week, usually from January through May.  While serving in the legislature, Schmitz also taught in a public high school.  When her legislative duties prevented her from teaching, she would leave a detailed lesson plan for a substitute.  Schmitz was not paid her teacher's salary when she was working as a legislator in Montgomery.

After her re-election, Schmitz became dissatisfied with splitting her legislative and teaching duties, so she quit her job as a teacher and started looking for new employment.  To this end, Schmitz asked Paul Hubbert, the Executive Secretary of the Alabama Education Association and an influential lobbyist in Montgomery, to help her find a job in the education field.  Hubbert in turn contacted Roy Johnson, then-Chancellor of the Alabama Department of Postsecondary Education, to find a job for Schmitz in the two-year college system.  Hubbert also told Seth Hammett,

---

[1]  Because we must determine whether the evidence is sufficient to support Schmitz's convictions, we state the evidence in the light most favorable to the Government. *United States v. Robertson*, 493 F.3d 1322, 1329 (11th Cir. 2007).

then-Speaker of the Alabama House of Representatives, that Schmitz would be coming to see him about employment. In addition to Hubbert's indirect assistance, Schmitz asked Speaker Hammett directly if he would make arrangements to have money placed in the budget so that she could be employed in the postsecondary system. Speaker Hammett told Johnson that he would help fund a job for Schmitz if Johnson could find one in his department.

Johnson considered various employment options for Schmitz, but he settled on the CITY Program–a federally-funded program that sought to develop the social, behavioral, and academic skills of juvenile offenders in the State of Alabama. Johnson selected this program for Schmitz because it was exempt from strict requirements for hiring processes applicable to the two-year college system. Johnson directed Dr. James Cornell, the administrator of the CITY Program and the president of Central Alabama Community College, to make a position available for Schmitz. Dr. Cornell said he would find a position for Schmitz, but he wanted assurance of additional funding for that position, and he wanted to meet Schmitz in person. Speaker Hammett directed the chairman of the House Education Appropriations Committee to alter the state budget to pay for Schmitz's new position, and Johnson arranged a meeting at the Alabama House of Representatives between Dr. Cornell, CITY Program director and founder Ed Earnest, and Schmitz.

After this meeting, Dr. Cornell offered Schmitz the position of Program Coordinator for Community and External Affairs. That position had never existed before, and was specially created for Schmitz. Dr. Cornell did not consider any other candidates for the position, nor did he conduct any serious review of Schmitz's qualifications before offering her the job. Johnson instructed Dr. Cornell to pay Schmitz a salary equal to the amount she had earned as a public school teacher. The letter offering Schmitz the position specified a salary of $42,623.

Dr. Cornell met with Schmitz in January 2003 and gave her a handwritten list of job duties for the first few months of her employment. Schmitz was essentially expected to "put a face" on the CITY Program and improve public relations. In particular, she was expected to develop a statewide public relations plan for the CITY Program; visit with public relations personnel from the Department of Postsecondary Education and the two-year colleges; visit each of the ten CITY Program sites in Alabama and become familiar with CITY Program personnel; develop relationships with various media outlets; solicit ideas from CITY Program employees; and analyze existing public relations materials. Schmitz understood that she was supposed to work forty hours per week for the CITY Program. She formally accepted the CITY Program position on January 24, 2003.

2. Schmitz receives notice that she cannot "double-count" her time and requests a flexible work schedule

Several days after accepting the CITY Program position, Schmitz received a letter from the Chief Examiner of Public Accounts for the State of Alabama reminding her that a recent Alabama Ethics Commission opinion prohibited state legislators from collecting compensation from public employers for time spent on legislative duties. To help ensure that Schmitz would not double-count time spent on legislative duties as time spent on her CITY Program responsibilities, the letter included a work log and time record to help capture specific details about the hours she worked.

A month or so after accepting the CITY Program position, on March 3, 2003, Schmitz mailed a letter to Dr. Cornell requesting a "flexible work schedule." This request was based on a policy established by Chancellor Johnson to allow a person to serve in the legislature and work in public education, but only if certain requirements were met. One of those requirements was that the employee keep a weekly log of their work hours. According to Schmitz, she requested this accommodation because of the difficulty in balancing the requirements of the CITY Program job and her duties as a state legislator. Dr. Cornell approved Schmitz's request for a flexible work schedule in April 2003, reminding her that she was

6

"expected to maintain a detailed log of activities relative to [her] legislative duties and to make them available for review upon request." (Dkt. 186 at 166-67.)

3. Schmitz fails to show up for work, and completes almost no assigned tasks

Much of the evidence at trial focused on the key issue of what work Schmitz did, or did not do, for the CITY Program after she obtained a flexible work schedule. The Government produced evidence that Schmitz rarely showed up at any CITY Program office and produced virtually no work product during her time on the payroll. For example, during the first month of her employment, in February 2003, a computer technician set up Schmitz's computer in her Huntsville office and left a note with her username and password in a sealed envelope in her desk drawer. When the technician returned to the office a month or so later, the sealed envelope was still in the drawer and the computer had not been used since its initial setup. Various employees at the CITY Program office in Huntsville testified that they rarely saw Schmitz during her three-year period of employment. The Huntsville program coordinator, in particular, testified that Schmitz would spend only thirty minutes to an hour at the office when she visited. And, he said, in more than three years he never saw her stay a full day.

Schmitz did not show up at the other CITY Program locations either. Although one of Schmitz's job duties was to visit all ten CITY Program locations, she failed to

7

visit at least five of them. Regional Coordinator Lester Crowder testified that she saw Schmitz about five times at CITY Program locations during her three years of employment. Schmitz was so rarely seen at CITY Program offices that several witnesses did not even know she was a CITY Program employee when they saw her at an all-employee conference in Orange Beach, Alabama in 2006.

Not only did Schmitz rarely show up for work, she also failed to complete the job duties assigned to her. Within the first year of her employment, then-director of the City Program Ed Earnest complained to Dr. Cornell that Schmitz was not doing her job. Earnest also expressed concern to Schmitz's business manager, Barbara Creel, that she was not doing anything. Creel testified that she could not think of any work Schmitz had done for the Program during her employment.

In November 2005, concerns about Schmitz's employment situation prompted then-director Larry Palmer and interim president of Central Alabama Community College Susan Sallato to complain to Chancellor Johnson that Schmitz was not coming to work.[2] Johnson directed Palmer and Sallatto to ensure that Schmitz came to work, but problems persisted. As a result, Johnson held a meeting in November 2005 with all three individuals. At the meeting, Palmer accused Schmitz of not

---

[2] Palmer was named Interim Director of the CITY Program when Earnest died in early 2005. Dr. Sallatto replaced Dr. Cornell as president of Central Alabama Community College around the same time.

showing up for work; Schmitz responded that she lacked specific duties and assignments. To resolve the problem, Johnson gave Schmitz a copy of the flexible work schedule policy and directed her to comply with it. He also told her he expected her to work forty hours each week for the CITY Program, apart from her time in the legislature. He further instructed her to show up for work, keep a weekly log of activities, and turn those logs over to Palmer for regular inspections. Finally, at Johnson's direction, Palmer assigned Schmitz two very specific tasks. One was to develop a public relations plan for the CITY Program and to implement that plan. The second was to develop a website for the CITY Program. When Johnson assigned these tasks, he was unaware that Dr. Cornell had assigned substantially similar tasks almost two years earlier, in January 2003.

By mid-December 2005, Schmitz still was not going to work. As a result, Palmer complained to Johnson again that Schmitz was neither coming to work nor completing assigned tasks. Palmer also told Johnson that he was concerned about disciplining Schmitz, a state legislator, because she may do harm to the CITY budget, or might cost him his job. Johnson assured Palmer that Schmitz would do neither, and told him to write her a letter that again outlined the clear expectation of work and demanded that she comply with applicable policies and instructions or face disciplinary action. On January 20, 2006, Palmer wrote Schmitz a letter requesting

9

(1) a progress report relating to development of a public relations plan, the proposed website, and a newsletter, and (2) a work log for Schmitz's activities for the previous three months. Palmer also asked Schmitz to submit work logs each month thereafter.

Schmitz responded sharply to Palmer's letter several days later, on January 26, 2006. She wrote that she could not fill out the requested progress reports because Palmer had not sent her the proper forms; that she was continuing to work on a public relations plan; and that she was working on a website but was waiting on budgetary information from Palmer. Schmitz also wrote that she needed to have specific directions from Palmer before being reprimanded in writing. The letter was printed on official House of Representatives letterhead, with copies sent to Roy Johnson and Paul Hubbert. Palmer testified that he interpreted the letter as an effort to intimidate him.

By June 2006, Schmitz's employment situation still had not improved. As a result, Palmer complained yet again to Johnson that he could not get Schmitz to come to work and perform the assigned tasks. Johnson told Palmer to place his concerns in writing and be prepared to move to the next level of disciplinary action toward her termination. So Palmer sent Schmitz another letter, again requesting that she submit written progress reports and copies of her work logs. When Schmitz did not comply, Palmer explained his concerns in a July 5, 2006 letter to Schmitz, requesting that she

10

provide copies of her weekly logs and other reports. In response to that letter, Schmitz submitted work logs and progress reports for the previous five months.

When Palmer left as director of the CITY Program in the fall of 2006, his successor, Roscoe Lane, continued to have problems with Schmitz. When Lane became director he, like Palmer, was concerned that Schmitz was not fulfilling her responsibilities to the Program, especially considering that she was one of the higher-paid employees in the Program. When Lane started raising questions about Schmitz, his supervisor told him he should be "very careful" in dealing with her. (Dkt. 195 at 56.) Lane nonetheless pressed the issue of Schmitz not working. He instructed Schmitz that she would have to start working and be in the Huntsville office every day. Schmitz then asked Lane whether he knew how she got the CITY Program job. When Lane responded that he did not know, Schmitz told him that Paul Hubbert had gotten the job for her through the former director of the Program, Ed Earnest. When Lane told Schmitz she needed to work, she said "she was going to call Mr. Paul Hubbert." (*Id.* at 58.) Schmitz denied making this statement to Lane.

To ensure that Schmitz would come to work, Lane assigned her to fill a vacant counselor position, which would have required her to come to the Huntsville office every day. Schmitz wrote a letter back to Lane refusing to fill the counseling position because it was not "in the best interest of the Program." (Gov't Ex. 17.) Instead, she

11

requested that she "continue to serve the CITY Program in the same manner as [she had] in the past." (*Id.*) Schmitz's employment was terminated about two weeks later, on October 19, 2006. After termination, she told one CITY Program employee that if Lane ever came to her as a legislator for any financial assistance for the CITY Program, then she would see to it that he would be fired.

4. The submission of false time sheets, progress reports, and other false statements

The evidence at trial showed that Schmitz, while on the CITY Program payroll, attempted to conceal her failure to work by submitting false time sheets, progress reports, and otherwise making false statements about her work performance.

CITY Program policies provide that all employees, including salaried employees like Schmitz, were required to submit monthly time sheets. Schmitz, who started her employment in February 2003, did not submit any time sheets until October 2003. After ignoring several requests from business manager Barbara Creel, Schmitz finally went to the business office and filled out eight months' time sheets all at once–without referring to any notes or a calendar. After October 2003, Schmitz continually failed to submit her time sheets on time.

When Schmitz did submit her time sheets, many of them were false, as shown by comparing them with information from her credit card statements for the same time periods. For example, Schmitz reported time for CITY Program work on days

12

when she was attending legislative conferences across the country, in San Francisco, Forth Worth, Seattle, Charleston, and St. Petersburg. Schmitz did this even though she had received a letter from the Examiner of Public Accounts the day before she started the CITY Program job stating specifically that she could not claim time for the CITY Program when she was also fulfilling her legislative duties. Schmitz testified at trial that she did not consider the legislative conferences to be part of her legislative duties because they were outside of the legislative session. Schmitz also reported time for CITY Program work when she was attending a Democratic Leadership Conference in Phoenix; when she was at a Wine Association conference in Destin, Florida; and when she was working on her beach house in Panama City Beach, Florida. Schmitz's explanation at trial for submitting false time sheets was that Barbara Creel, the business manager, instructed her to record eight hours of work every day, even if she did not actually work those hours. Creel denied telling Schmitz this.

Schmitz also reported eight hours of CITY Program work for each day from May 17 through May 19, 2005, even though she was attending a tourism conference in Orange Beach, Alabama hosted by the Gulf United Metropolitan Business Organization ("GUMBO"). GUMBO paid for Schmitz and other members of the House Tourism and Travel Committee to attend a conference that featured tourism

13

presentations and a sunset dolphin cruise. Schmitz testified that she promoted the CITY Program during the conference, but the lobbyist who hosted the trip testified that Schmitz never spoke to him about the CITY Program.

In addition to the time sheets, Schmitz was also required to submit progress reports every month. Although Schmitz testified that she submitted progress reports every month, this testimony conflicted with Palmer's testimony and his letters requesting such reports. In the reports that Schmitz submitted, she reported that in January 2006 she was soliciting ideas and suggestions from each of the program centers for development of positive public relations. She also reported that in March 2006 she had requested human-interest stories from each of the ten Program sites so that the stories could be submitted to various media outlets, and she "encouraged each of the program coordinators to keep a record of positive stories that can be used in the future for publication." (Gov't Ex. 57.) Several program coordinators testified, however, that Schmitz never contacted them to discuss their ideas about public relations, never requested information for human-interest stories, and never asked them to keep records of positive news stories. One program coordinator did not even know Schmitz was the public relations person for the CITY Program.

Schmitz's trial testimony about several representations on her progress reports directly conflicted with the testimony of other witnesses. First, in January 2006,

14

Schmitz specifically reported that she met with Pam Huff, a television news producer in Birmingham, about the CITY Program. But Huff testified that she never spoke with Schmitz about the Program. Second, Schmitz testified that she met with Kathy Sawyer, the former Commissioner of the Department of Mental Heath, and mentioned the CITY Program often. But Sawyer testified that she never spoke to Schmitz about the Program. Third, Schmitz testified that she met with Page Walley, the former Commissioner of the Department of Human Resources, to discuss the CITY Program. But Walley testified that he never spoke with Schmitz about the Program. Finally, in her June 2006 progress report, Schmitz represented that she had contacted the presidents of the two-year colleges to discuss the CITY Program and to request their support. And, at trial, Schmitz specifically recalled meeting with Dr. Marilyn Beck, the president of Calhoun Community College. But Dr. Beck did not recall ever discussing the CITY Program with Schmitz.

## B. PROCEDURAL HISTORY

1. The Indictment

In January 2008, the grand jury indicted Schmitz. Counts One through Four charge that she committed mail fraud in violation of 18 U.S.C. § 1341. Her scheme to defraud involved her taking around $177,251.82 in salary and other benefits from the CITY Program, a federally-funded program for at-risk youth, even though she

performed little or no work for the program, generated virtually no services or work product, and rarely appeared for work at the CITY Program offices. To accomplish this scheme, the indictment alleges that Schmitz obtained authorization to perform her job based on a "flexible work schedule." The indictment further alleges that, in order to conceal her fraudulent scheme, she prepared and submitted false and fraudulent statements regarding the number of hours she worked and the volume and nature of her services. The indictment finally alleges that Schmitz used the mails on four separate occasions in furtherance of this scheme: she received a letter of appointment to the CITY Program position on January 16, 2003 from then-director Ed Earnest (Count One); she wrote a letter to her supervisor, Dr. Cornell, requesting a flexible work schedule (Count Two); she wrote a letter to Larry Palmer, another then-director of the CITY Program, explaining why she had not filled out progress reports and updating him on the work that she had performed (Count Three); and she wrote a letter to Roscoe Lane, yet another then-director of the City Program, regarding his appointment of her to fill a counseling vacancy so that her work could be more closely monitored.

Counts Five through Eight charge Schmitz with theft concerning a program receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A).[3] The indictment alleges that Schmitz was an agent of the CITY Program, and that the CITY Program was an organization that received federal benefits in excess of $10,000 per year. The indictment further alleges that Schmitz knowingly and willfully did "embezzle, steal, obtain by fraud and without authority convert to her own use, and intentionally misapply" the salary she received over four years from working for the CITY Program. (Dkt. 1 at 5-6.)

2. Motion to Dismiss the Indictment and Bill of Particulars

Schmitz filed a motion for a bill of particulars, seeking more specific information regarding the charged scheme to defraud. She then filed a motion to

---

[3] 18 U.S.C. § 666 provides, in relevant part:
> (a) Whoever, if the circumstance described in subsection (b) of this section exists-
> (1) being an agent of an organization . . . (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that . . . is valued at $5,000 or more, and . . . is owned by, or is under the care, custody, or control of such organization . . . shall be fined under this title, imprisoned not more than 10 years, or both.
>
> (b) The circumstance referred to in subsection (a) . . . is that the organization . . . receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant . . . .

18 U.S.C. § 666(a)(1)(A), (b).

17

dismiss the indictment, arguing that all counts were insufficiently specific. As to the mail-fraud counts, she argued that they did not include a statement of facts and circumstances so as to reasonably inform her of the scheme to defraud. As to the federal-funds counts, she argued that the allegations of fraud in those counts were insufficient because they too did not include a statement of facts, and did not incorporate any of the allegations of fraud in the mail-fraud counts. Schmitz also moved to dismiss the federal-funds counts based on the "bona fide salary" exception in § 666(c).

The magistrate judge recommended denial of Schmitz's motion to dismiss the indictment, finding that the indictment sufficiently charged both mail fraud and theft concerning a program receiving federal funds. The district court adopted the magistrate judge's recommendation. With respect to Schmitz's motion for a bill of particulars, the magistrate judge required the Government to "explain upon what basis it has concluded that Ms. Schmitz obtained her position through illegitimate means and the relationship between that claim and the mail fraud counts." (Dkt. 72 at 5.) In its bill of particulars, the Government explained that Schmitz "utilized her status as a legislator to request and receive preferential treatment in obtaining a position with the CITY Program." (Dkt. 75 at 1.) The Government further explained that Schmitz–with the assistance of the Speaker of the Alabama House of Representatives,

18

the Chancellor of the Department of Postsecondary Education, and an influential lobbyist–obtained a position that did not exist before and for which no other applicants were considered. The Government finally explained that the "illegitimate means" Schmitz employed to obtain her position were related to the mail-fraud charges because they "illuminate[d] [her] fraudulent intent, for her unusual action[s] serve[d] to demonstrate that she never intended to actually perform any work in her role as a CITY Program employee." (*Id.* at 2-3.)

3. The trial, verdicts, and sentencing

The case ultimately proceeded to a nine-day trial. At the close of the Government's case-in-chief, Schmitz moved for a judgment of acquittal under Fed. R. Crim. P. 29, and the district court denied the motion. Schmitz then presented testimony from twenty-four witnesses, and ultimately testified in her own defense. During her cross examination, the prosecutor asked Schmitz, on several occasions, to provide the names of people who could corroborate the work that she performed for the CITY Program. In addition, the prosecutor, after pointing out that Schmitz's testimony conflicted with the testimony of other Government witnesses, asked Schmitz if those witnesses were lying. Each time Schmitz attempted to explain the discrepancy in testimony, the prosecutor repeatedly questioned her until she was forced to say whether a previous witness was lying. At the close of all the evidence,

19

Schmitz renewed her motion for a judgment of acquittal. The district court denied that motion.

During the prosecutor's closing argument, he referred to the evidence developed during Schmitz's cross-examination. In particular, he commented several times as to how long the list of liars must be if Schmitz's testimony were true. He also commented on Schmitz's failure to corroborate her contention that she did various tasks for the CITY Program, pointing out that she had the same subpoena power as the Government to bring in witnesses to corroborate her story.

The jury acquitted Schmitz on one of the mail-fraud counts (Count One), and convicted on all other counts.[4] The district court sentenced Schmitz to thirty months of imprisonment on each count of conviction, to run concurrently, for a total of thirty months. The district court also ordered restitution and forfeiture in the amount of $177, 251.82.

## II. ISSUES ON APPEAL

Schmitz raises the following issues on appeal: (1) whether the district court erred in denying her motion to dismiss the indictment because the indictment failed to allege the offenses of mail fraud and theft concerning a program receiving federal

---

[4] Count One was based on Schmitz's receipt of a letter appointing her to the CITY Program position.

funds; (2) whether the district court erred by denying her motion for judgment of acquittal because the evidence was insufficient to support convictions for mail fraud and theft concerning a program receiving federal funds; (3) whether the prosecutor committed misconduct by asking Schmitz to identify witnesses or other evidence that could corroborate her testimony; and (4) whether the prosecutor committed misconduct by forcing Schmitz to testify during cross-examination that at least a dozen other witnesses were lying during their testimony, and by making comments during closing arguments as to how long the list of lying witnesses must be in order for Schmitz's testimony to be true.[5]

## III.  STANDARDS OF REVIEW

"We review the district court's denial of a motion to dismiss the indictment for abuse of discretion, but the sufficiency of an indictment is a legal question that we review de novo." *United States v. Pendergraft*, 297 F.3d 1198, 1204 (11th Cir. 2002) (internal citation omitted).  We review the sufficiency of the evidence de novo, considering the evidence "in the light most favorable to the government" and "resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict."

---

[5]  Schmitz also raises the issue of whether the district court erred by instructing the jury that it could consider Ala. Code § 36-25-7(d) for purposes of determining whether Schmitz had the requisite criminal intent.  Considering the district court's limiting instruction and the totality of the evidence supporting Schmitz's guilt, any error in giving the instruction was harmless under Fed. R. Crim. P. 52(a).  *See United States v. Drury*, 396 F.3d 1303, 1314 (11th Cir. 2005) (noting that jury instructions are subject to harmless error review).

*United States v. Robertson*, 493 F.3d 1322, 1329 (11th Cir. 2007) (internal quotation marks and citation omitted). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). We review claims of prosecutorial misconduct de novo because they involve a mixed question of law and fact. *United States v. Merrill*, 513 F.3d 1293, 1306 (11th Cir. 2008). But, because Schmitz's trial counsel did not object to the prosecutor's questions asking her to comment on the truthfulness of other witnesses or the prosecutor's related comments during closing argument, her claim of prosecutorial misconduct based on those questions and comments is reviewed for plain error. *Id.* at 1306-07.

## IV. DISCUSSION

## A. LEGAL SUFFICIENCY OF THE INDICTMENT

Schmitz asserts error in the district court's denial of her motion to dismiss the indictment, contending that the mail-fraud and federal-funds charges are legally insufficient.

"An indictment is considered legally sufficient if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *United States v. Jordan*, 582 F.3d 1239, 1245 (11th Cir. 2009) (citation and quotations omitted). "In determining whether an indictment is sufficient, we read it as a whole and give it a 'common sense construction.'" *Id.* (citing *United States v. Gold*, 743 F.2d 800, 813 (11th Cir. 1984) and *United States v. Markham*, 537 F.2d 187, 192 (5th Cir. 1976)).[6] "In other words, the indictment's 'validity is to be determined by practical, not technical, considerations.'" *Jordan*, 582 F.3d at 1245 (citing *Gold*, 743 F.2d at 812).

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

1.  Mail Fraud (Counts One through Four)

The indictment charges Schmitz with four counts of mail fraud, in violation of

18 U.S.C. § 1341.[7] Schmitz contends that the mail-fraud counts are insufficient

because they do not state a criminal offense and do not give her adequate notice of

the alleged scheme to defraud. "Mail fraud consists of the following elements: (1) an

intentional participation in a scheme to defraud a person of money or property, and

(2) the use of the mails in furtherance of the scheme." *United States v. Sharpe*, 438

F.3d 1257, 1263 (11th Cir. 2006) (citation and quotations omitted).

We find that Counts Two through Four adequately allege the mail-fraud

offenses. After identifying Schmitz and the CITY Program, the indictment alleges

that from 2003 to 2006 Schmitz intentionally devised a scheme to defraud the CITY

Program of $177, 251.82 in salary and other benefits. The indictment alleges that

Schmitz accepted this money even though she performed "virtually no services,"

"generated virtually no work product," and "rarely even appeared for work at CITY

Program offices." (Dkt. 1 at 3.) To accomplish her fraudulent scheme, the indictment

alleges, Schmitz obtained her job through "illegitimate means" and received

authorization to perform her job based on a "flexible work schedule." (*Id.* at 2-3.)

The indictment further alleges that Schmitz sought to conceal, and therefore facilitate,

---

[7] The jury acquitted Schmitz on one of the mail-fraud counts (Count One).

24

her fraudulent scheme by preparing and submitting false statements regarding the number of hours she worked and the volume and nature of her services. The final paragraph of the indictment then charges that Schmitz used the mails on four separate occasions to facilitate the fraudulent scheme. Based on these allegations, the indictment presents the essential elements of mail fraud and provided Schmitz with the notice necessary to enable her to defend against those charges. The district court did not err in denying Schmitz's motion to dismiss the mail-fraud counts.[8]

2. Federal-Funds Counts (Counts Five through Eight)

The indictment charges Schmitz with four counts of theft concerning a program receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A). The federal-funds counts incorporate the first two paragraphs of the indictment, which describe Schmitz's background and the CITY Program, but they do not incorporate or re-allege any of the allegations of fraud in the mail-fraud counts. Instead, the federal-funds counts allege that Schmitz was an agent of the CITY Program, and the CITY

---

[8] In so concluding, we reject Schmitz's contention that the allegation she obtained her job through "illegitimate means" was so vague that it required speculation as to a fundamental part of the charges against her. First, this allegation was only one of six allegations describing the nature and extent of the scheme to defraud the CITY Program. Regardless of how Schmitz obtained her job, the indictment alleges that she failed to perform it and deliberately covered up that lack of performance with false statements in order to receive payment. Second, even if the term "illegitimate means" is vague, any notice problems were cured when the Government provided a bill of particulars explaining the meaning of the term and how it relates to the mail-fraud counts. *See United States v. Perkins*, 748 F.2d 1519, 1526 (11th Cir. 1984) (noting that bill of particulars can satisfy a defendant's need for additional information to prepare defense).

Program received federal benefits in excess of $10,000 per year. The indictment then charges that Schmitz, from January 2003 to October 2006, "knowingly and willfully did embezzle, steal, obtain by fraud and without authority convert to her own use, and intentionally misapply" the salary she received from the CITY Program from 2003 through 2006, with each year of salary representing a separate count. (Dkt. 1 at 5-6.)

Schmitz argues that the allegations of fraud in the federal-funds counts are insufficient because they do not present the essential elements of fraud and do not notify her of the charges to be defended against. Schmitz points out that the federal-funds counts provide no factual allegations whatsoever regarding the scheme to defraud, and do not incorporate any of the allegations of fraud in the mail-fraud counts.

We hold that the allegations of fraud in the federal-funds counts are insufficient because they provide absolutely no factual detail regarding the scheme to defraud the CITY Program. As we have previously noted, for an indictment to be legally sufficient, it must notify the accused of the charges to be defended against. The indictment must contain "a plain, concise, and definite written statement of the *essential facts* constituting the offense charged[.]" Fed. R. Crim. P. 7(c)(1) (emphasis added). Even when an indictment "tracks the language of the statute, 'it must be accompanied with such a statement of the facts and circumstances as will inform the

26

accused of the specific offense, coming under the general description, with which he is charged.'" *United States v. Bobo*, 344 F.3d 1076, 1083 (11th Cir. 2003) (citing *Russell v. United States*, 369 U.S. 749, 765, 82 S. Ct. 1038, 1048-49 (1962)). Counts Five, Six, Seven, and Eight simply allege that Schmitz did "embezzle, steal, obtain by fraud and without authority convert to her own use, and intentionally misapply" the salary and other benefits she received from the CITY Program. (Dkt. 1 at 5-6.) While this language tracks 18 U.S.C. § 666, the federal-funds counts allege no facts or circumstances that inform Schmitz of these specific charges. As a result, the allegations of fraud in the federal-funds counts are insufficient as a matter of law.

We reject the Government's contention that the federal-funds counts sufficiently charge fraud if the indictment is considered as a whole, and given a common-sense construction. The Government would have us overlook the complete absence of factual allegations in the federal-funds counts because the mail-fraud counts adequately describe Schmitz's fraudulent scheme. This we cannot do because it would contradict the principle that "each count of an indictment must be regarded as if it were a separate indictment and must stand on its own content without dependence for its validity on the allegations of any other count not expressly incorporated." *United States v. Huff*, 512 F.2d 66, 69 (5th Cir. 1975) (citations

27

omitted).[9] The Government is correct that we have previously stated that the validity of an indictment is determined from reading it "as a whole." *Jordan*, 582 F.3d at 1245; *United States v. Diwan*, 864 F.2d 715, 719 (11th Cir. 1989); *Markham*, 537 F.2d at 192. But that does not mean factual allegations in one count are somehow automatically incorporated into other counts. To the contrary, courts have explained that when allegations in one count are incorporated into another count under Federal Rule of Criminal Procedure 7(c), such incorporation must be express. *Davis v. United States*, 357 F.2d 438, 440 n.2 (5th Cir. 1966); *United States v. Redcorn*, 528 F.3d 727, 734 -735 (10th Cir. 2008) ("There is no need to look beyond the borders of a particular count to determine what offense is charged; indeed, it is generally improper to do so except where a count incorporates other allegations expressly, as permitted by Federal Rule of Criminal Procedure 7(c)(1)."); *United States v. Knowles*, 29 F.3d 947, 952 (5th Cir. 1994) ("While it is true that an allegation made in one

---

[9] In *Huff*, the first count of the indictment charged that the defendant illegally distributed "3,4 methylenedioxy amphetamine," which was a controlled substance, but the second count charged possession of "methylenedioxy amphetamine," which was a different drug not listed on the statutory schedule of controlled substances. *Huff*, 512 F.2d at 68-69. The Fifth Circuit held that the second count did not charge an offense, and that the district court's instruction to the jury that count two should be described as in count one did not cure the defect. *Id.* at 69.

Seeking to distinguish *Huff*, the Government argues that the *Huff* indictment completely failed to allege an element of a crime, while the indictment in this case alleges a crime but simply does not describe the fraudulent scheme in sufficient detail. We are not persuaded. While *Huff* concerned the omission of an element of a crime, the Fifth Circuit's larger analytical point was that each count of an indictment must be regarded separately, unless the factual allegations of one count are expressly incorporated into another.

28

count of an indictment may be incorporated by reference in another count of the indictment, we have held that any such incorporation must be expressly done.") (internal citation omitted); *United States v. Miller*, 774 F.2d 883, 885 (8th Cir. 1985) (citing *Huff* and concluding that each count of an indictment "must stand on its own, and cannot depend for its validity on the allegations of any other count not specifically incorporated") (internal quotation marks and citation omitted); *United States v. Fulcher*, 626 F.2d 985, 988 (D.C. Cir. 1980) (citing *Huff* and concluding that one count cannot "absorb by osmosis" the allegations of another count).[10] The rule requiring express incorporation by reference is especially important in this case, where it is not at all apparent from the face of the indictment that the facts of the mail-

---

[10] We recognize some tension between the line of cases establishing that we analyze the indictment "as a whole" and the line of cases establishing that each count of an indictment must stand on its own content. But they are reconcilable. First, we have often said that we read the indictment "as a whole" in the context of analyzing the sufficiency of allegations in a single count. In that context, we have had no problem endorsing the idea that allegations in a particular count can inform other allegations in the same count. The need for express incorporation does not arise because there is only one count at issue. *See, e.g., Gold*, 743 F.2d at 812-13; *Markham*, 537 F.2d at 192. Second, in reading indictments "as a whole," we have meant that factual allegations in one count can inform or provide meaning to the factual allegations in another count. *See, e.g., Jordan*, 582 F.3d at 1246. The need for express incorporation does not arise because factual allegations are not being transplanted in their entirety but are simply informing the meaning of other allegations that are already in the other count.

We are not dealing in this case with factual allegations in one count that simply inform or provide meaning to factual allegations in a separate count. Indeed, there are no factual allegations at all in the federal-funds counts regarding the scheme to defraud. Therefore, while we read the indictment "as a whole," that approach, under the facts of this case, does not dispense with the express-incorporation requirements of Fed. R. Crim P. 7(c)(1). Because the allegations of fraud in the federal-funds counts include absolutely no factual detail, either directly or through express incorporation, they fail to provide Schmitz with notice of the charges to be defended against and are legally insufficient.

fraud counts overlap with the facts of the federal-funds counts. The federal-funds counts (Counts Five through Eight) do not stand on their own content, and do not expressly incorporate any allegations about the scheme to defraud from the mail-fraud counts. And, the district court did not instruct the jury that the federal-funds counts required proof of the scheme to defraud alleged in the mail-fraud counts. We therefore conclude that the district court erred in denying Schmitz's motion to dismiss the fraud charges in the federal-funds counts.

While we have concluded that the fraud charges in the federal-funds counts are insufficient, we must still address whether Schmitz's convictions on these counts can stand. The federal-funds counts allege all five means by which § 666(a)(1)(A) can be violated. That is, the indictment alleges that Schmitz "knowingly and willfully did embezzle, steal, obtain by fraud and without authority convert to her own use, and intentionally misapply" the salary she received as a CITY Program employee. (Dkt. 1 at 5-6.) The district court instructed the jury that Schmitz could be found guilty of an offense under § 666(a)(1)(A) if she "misapplied, embezzled, stole, obtained by fraud, or otherwise without authority . . . [] convert[ed] to her own use" the money she received from the CITY Program. (Dkt. 199 at 2022-23.) The court did not specifically instruct that any one means is sufficient to convict Schmitz on the

30

federal-funds counts, but the use of the disjunctive word "or" suggests that this was the intent of the charge.

We are thus faced with the question of whether the jury's general verdict convicting Schmitz on the federal-funds counts can stand where one of the alternate theories of criminal liability in those counts is based on a legally insufficient indictment.[11] We find that the convictions on the federal-funds counts cannot stand because the allegations of fraud in those counts are legally insufficient, and we do not know whether the jury relied on those legally insufficient allegations in convicting Schmitz on the federal-funds counts. *See Griffin v. United States*, 502 U.S. 46, 59, 112 S. Ct. 466, 474 (1991) (noting that jurors in a criminal case are "well equipped to analyze the evidence" in order to avoid resting a guilty verdict on a "factually inadequate" theory, but "are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law"); *United States v. Shotts*, 145 F.3d 1289, 1293 n.3 (11th Cir. 1998) ("A general verdict which may rest upon

---

[11] This is not to say that the indictment sufficiently alleges misapplication, embezzlement, theft, or conversion. And certainly not to say that the evidence supports those theories of criminal liability. We do not address those issues because Schmitz did not move to dismiss those alternate theories of criminal liability in the district court and does not specifically challenge those alternate theories of criminal liability on appeal. And the Government, as counsel acknowledged at oral argument, has relied solely on fraud as the theory of criminal liability throughout this case. Thus we address only the  allegations of fraud in the federal-funds counts.

an insufficient legal theory must be reversed.").[12]  We accordingly vacate Schmitz's

convictions on Counts Five, Six, Seven, and Eight.

## B.  SUFFICIENCY OF THE EVIDENCE

Schmitz contends that the evidence at trial was insufficient to sustain her

convictions for mail fraud.[13]  Schmitz argues that the evidence was insufficient for the

mail-fraud counts because it (1) failed to establish her specific intent to defraud, and

(2) failed to establish a connection between the mailings at issue and Schmitz's

receipt of her salary from the CITY Program.  We disagree.

Viewed in the light most favorable to the Government, the evidence at trial

established Schmitz's specific intent to defraud the CITY Program.  The evidence

---

[12]  We recognize that if *the evidence* is merely insufficient as to one alternate theory of criminal liability in a particular count, then the conviction will stand as long as the evidence suffices to support any one of the submitted theories.  *See, e.g., United States v. Browne*, 505 F.3d 1229, 1261  (11th Cir. 2007).  That principle cannot save the convictions on the federal-funds counts in this case, however, because *the indictment* is legally insufficient.

[13]  Schmitz also contends that the evidence was insufficient to sustain her convictions on the federal-funds counts because the money she received was a bona fide salary under 18 U.S.C. § 666(c).  We reject this argument.  Under § 666(c), the federal-funds statute "does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."  As the Fifth Circuit has concluded, "a salary is not bona fide or earned in the usual course of business under § 666(c) if the employee is not entitled to the money."  *United States v. Williams*, 507 F.3d 905, 908 (5th Cir. 2007).  And, whether wages are bona fide and earned in the usual course of business is generally a question of fact for the jury to decide.  *Id.* at 909.  Here, the district court instructed the jury on the bona fide salary exception, and the evidence, discussed at length in the context of the mail-fraud charges, was sufficient to support the jury's conclusion that the salary and benefit payments to Schmitz were not earned in the usual course of business.

established that Schmitz used her position as a state legislator to have a job specially created for her. Once she got the job, Schmitz's job performance was almost non-existent. In more than three years on the CITY Program payroll, Schmitz rarely showed up at any office and failed to complete the assigned tasks of implementing a statewide public relations campaign and developing a website. To keep her supervisors from knowing just how little work she was doing, Schmitz persuaded her supervisor, Dr. Cornell, to authorize a "flexible work schedule" that allowed her to work irregular hours from locations other than CITY Program offices. Schmitz further concealed her scheme by submitting fraudulent reports about hours worked and work activities. When one of her supervisors pressed Schmitz as to why she was not showing up for work, she threatened to call Paul Hubbert, a prominent lobbyist who assisted in creating her position. Interpreted in the Government's favor, this statement further showed that Schmitz never intended to work for the CITY Program but rather wanted to use her political connections to keep her pay-for-no-work scheme going. And, as discussed below, Schmitz mailed the letters identified in Counts Two, Three, and Four in furtherance of her fraudulent scheme. The evidence supports a jury finding as to each element of the mail-fraud charges on which she was convicted.

Furthermore, Schmitz decided to testify in this case, and her own testimony helped to establish the necessary elements for mail fraud. "[W]hen a defendant takes the stand in a criminal case and exposes [her] demeanor to the jury, the jury may make adverse determinations about [her] credibility and reject [her] explanation as a complete fabrication." *United States v. Vazquez*, 53 F.3d 1216, 1225 (11th Cir. 1995). The testifying defendant thus "runs the risk that if disbelieved the jury might conclude the opposite of [her] testimony is true." *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) (internal quotation marks and citation omitted). And, at least where "some corroborative evidence of guilt exists for the charged offense[,]" as in this case, "the defendant's testimony, denying guilt, may establish, by itself, elements of the offense." *Id.* at 314-15. "This rule applies with special force where the elements to be proved for a conviction include highly subjective elements" such as "the defendant's intent or knowledge." *Id.* at 315.

Here, Schmitz's testimony attempted to explain the circumstances surrounding her job with the CITY Program. She testified that she did not ask Speaker Hammett to put money in the budget for her job; that she had no intention of using her flexible work schedule to avoid working; that she never knowingly submitted a false time sheet; that she never submitted work logs in an effort to defraud anyone; and that she never intended to defraud the CITY Program in general. The jury was free to reject

34

Schmitz's testimony and conclude that the opposite was true. *Brown*, 53 F.3d at 314. The Government's evidence, together with Schmitz's testimony which the jury rejected, supports Schmitz's convictions for mail fraud in Counts Two, Three, and Four.

In challenging the sufficiency of the evidence, Schmitz has characterized her prosecution as the criminalizing of poor job performance, arguing that the Government simply thought she did not work as much as she should have. That description does not capture this case. More than merely a sub-standard employee, Schmitz engaged in a calculated and extensive pattern of fraudulent conduct designed to allow her to collect a state-government salary while performing almost no work. She accomplished this scheme through demonstrably false reports and time sheets. And, when people started asking questions, she used her status as state legislator to keep the scheme going. While we share the concern expressed about criminalizing poor job performance, this case does not belong in that category.

Schmitz also contends that the evidence does not support her mail-fraud convictions because the Government did not prove that the mailings listed in the mail-fraud counts were made in furtherance of the alleged scheme to defraud. "While a mailing is a required element of a § 1341 claim, the use of the mails need not be an essential element of the scheme; for a mail fraud conviction, it is sufficient if the

government shows that the mailing was 'incident to an essential part of the scheme' or 'a step in the plot.'" *United States v. Lee*, 427 F.3d 881, 887 (11th Cir. 2005) (citing *United States v. Waymer*, 55 F.3d 564, 569 (11th Cir. 1995)).

Count Two was based on the March 3, 2003 letter Schmitz wrote to one of her supervisors, Dr. Cornell, formally requesting a flexible work schedule. This letter, written just one month after she went on the CITY Program payroll, requested a flexible work schedule because of Schmitz's purported need to balance the requirements of her CITY Program job and her duties as a legislator. The Government, however, produced evidence, previously discussed at length, that Schmitz never attempted to balance her two jobs and instead performed almost no work for the CITY Program while collecting a full salary. Given the evidence establishing that Schmitz did not intend to fulfill her duties for the CITY Program, we find that a reasonable jury could find that the March 3, 2003 letter was a mailing in furtherance of the scheme to defraud. A reasonable jury could view the letter to Dr. Cornell requesting a flexible work schedule as a step in the fraudulent plot because it allowed Schmitz to conceal her scheme by making it more difficult for supervisors to determine just how little work she was doing for the Program. The evidence sufficiently supports the jury's verdict as to Count Two.

Count Three was based on the January 26, 2006 letter that Schmitz wrote to then-director Larry Palmer. Schmitz wrote the letter in response to Palmer's request for a progress report on her activities from November of 2005 to January of 2006. The letter was written on official Alabama House of Representatives letterhead and copied to Roy Johnson and Paul Hubbert. In the letter, Schmitz writes that she has not filled out the requested progress reports because she has not received the proper forms from Palmer. She also writes that her progress for the website development has been stalled because Palmer has not provided budgetary information. We find that a reasonable jury could find that the January 26, 2006 letter was a mailing in furtherance of the scheme to defraud. A reasonable jury could view the letter as Schmitz's effort to conceal her complete lack of progress in her assigned tasks, and to shift the blame toward Palmer for her failure to submit progress reports. And, because the letter was written on official stationary and sent to Hubbert and Johnson, a reasonable jury could conclude that the letter was an implicit threat to complain to Johnson and Hubbert about Palmer's questioning of her scheme. This inference is further supported by Schmitz's subsequent conversation with then-director Roscoe Lane, where she explicitly threatened to call Hubbert when Lane questioned her lack of work. The evidence sufficiently supports Count Three.

Count Four was based on the October 5, 2006 letter Schmitz wrote to then-director of the CITY Program Roscoe Lane. When Lane became director, he discovered that Schmitz was being paid a full-time salary and benefits even though she rarely showed up for work. To ensure that Schmitz showed up for work, Lane assigned her to a vacant counselor position, which would have required her to work at the Huntsville office every day. Schmitz wrote a letter to Lane refusing the assignment because she felt it was "not in the best interest of the Program" and she could "best serve the Program in other ways." (Gov't Ex. 17.) She requested that she continue to serve the CITY Program in the same manner as she had in the past. We find that a reasonable jury could find that the October 5, 2006 letter was a mailing in furtherance of the scheme to defraud. A reasonable jury could view the letter as Schmitz's attempt to persuade the director of the Program to keep her on the payroll without meaningful oversight or accountability so that she could collect payment while doing almost no work. The evidence sufficiently supports Count Four.

## C. PROSECUTORIAL MISCONDUCT:

## SHIFT OF BURDEN OF PROOF

During Schmitz's cross-examination, the prosecutor, on several occasions, asked Schmitz to provide the names of people who could corroborate the work that she performed for the CITY Program. During the Government's closing argument, the prosecutor commented that Schmitz could not corroborate her work performance and that she has the same subpoena power as the Government to produce witnesses and documents. Schmitz argues that the prosecutor's questions and comments impermissibly shifted the burden of proof from the Government to her.

Because Schmitz's trial counsel objected to the prosecutor's cross-examination questions and closing-argument comments that purportedly shifted the burden of proof, we review this claim of prosecutorial misconduct, which involves a mixed question of law and fact, de novo. *United States v. Merrill*, 513 F.3d 1293, 1306 (11th Cir. 2008). To find prosecutorial misconduct, a two-element test must be met: (1) the questions or comments must be improper, and (2) the questions or comments must prejudicially affect the substantial rights of the defendant. *See United States v. Wilson*, 149 F.3d 1298, 1301(11th Cir. 1998).

We find no impropriety in the prosecutor's questions and comments pertaining to Schmitz's inability to corroborate her work for the CITY Program because they

tested the plausibility of Schmitz's account. *United States v. Demarest*, 570 F.3d 1232, 1242 (11th Cir. 2009). The Government produced substantial evidence that Schmitz was not completing work for the CITY Program. When Schmitz testified to the contrary, the Government tested the plausibility of her story by asking who could corroborate her testimony. That line of questioning did not shift the burden of proof. And, we have specifically held that the prosecution can note that the defendant has the same subpoena power as the Government. *United States v. Hernandez*, 145 F.3d 1433, 1438-39 (11th Cir. 1998). Moreover, even if some of the prosecutor's questions slightly suggested that Schmitz had the burden of proof, the district court cured any possibility of prejudice with its clear and repeated instructions on the prosecution's burden of proof. *See United States v. Simon*, 964 F.2d 1082, 1087 (11th Cir. 1992) ("This court has held that the prejudice from the comments of a prosecutor which may result in a shifting of the burden of proof can be cured by a court's instruction regarding the burden of proof."). We accordingly reject Schmitz's contention that the prosecutor engaged in misconduct by shifting the burden of proof.

## D.  PROSECUTORIAL MISCONDUCT:
## THE "WERE-THEY-LYING" QUESTIONS AND COMMENTS

Schmitz contends that, during her cross-examination, the Government improperly required her to assess the truthfulness of previous witnesses. On cross-examination, the prosecutor questioned Schmitz as follows:

Q. (by the prosecutor:) [L]et's get a list going of everybody you say is lying, okay? Seth Hammett. He's a liar?

A. I said I – what I answered was my answer is different from his. I never called him a liar.

Q. Did he tell the truth when he said that you came to him and asked him to put money in the budget to fund your job?

A. No, he did not.

Q. He lied?

A. I never used the word "lie."

Q. Why not?

A. I just don't like the word.

Q. So he didn't tell the truth. Does that make you feel better?

41

(Dkt. 202 at 9.) The prosecutor then called out the names of twelve witnesses who had testified in the case and asked Schmitz if they should be added to the "list" of purported liars. (*Id.* at 10-17.) Each time Schmitz attempted to explain the discrepancy in testimony, the prosecutor repeatedly questioned her until he was able to force her to say whether a previous witness was telling the truth or whether the witness should be added to the "liar list." (*Id.*)

In closing arguments, the prosecutor continued to refer to the list of purported lying witnesses. The prosecutor said: "These people are not all making it up, ladies and gentlemen. It's not that the list is now 17 people are lying and the defendant is the one person telling the truth." (Dkt. 199 at 73.) At one point, the prosecutor stated that they were "going to have to add some more names . . . to the list of people who were obviously conspiring and lying against the defendant." (*Id.* at 129.)

Because Schmitz's trial counsel did not object to the were-they-lying questions and related comments, we review the impact of this conduct on the fairness of the trial under the plain error standard of review. Under this standard, Schmitz must show that: "(1) an error occurred; (2) the error was plain; (3) it affected [her] substantial rights; and (4) it seriously affected the fairness of the judicial proceedings." *United States v. Gresham*, 325 F.3d 1262, 1265 (11th Cir. 2003) (citation omitted); *see also United States v. Olano*, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776 (1993) (articulating

42

four conditions of plain error rule). Only if all four of those showings are made does a court of appeals have any authority to correct an error that was not preserved by a timely objection in the district court. *Olano*, 507 U.S. at 732, 741, 113 S. Ct. at 1776-77, 1781. Schmitz has convinced us that there was error, but we do not think there was plain error.

We first conclude that there was error in the district court's decision to allow the prosecutor to require Schmitz to say whether other witnesses were lying, and to allow the prosecutor to make comments related to these questions in his closing argument. In evaluating the propriety of the prosecutor's conduct in this case, we analyze separately the questions posed on cross-examination and the comments made during closing arguments.

With regard to the questions posed on cross-examination, we begin by noting that most of the federal courts of appeals that have examined the propriety of questions posed to a criminal defendant about the credibility of government witnesses have found that such questions are improper. *See United States v. Harris*, 471 F.3d 507, 511 (3d Cir. 2006); *United States v. Thomas*, 453 F.3d 838, 846 (7th Cir. 2006); *United States v. Williams*, 343 F.3d 423, 437 (5th Cir. 2003); *United States v. Sanchez*, 176 F.3d 1214, 1219-1220 (9th Cir. 1999); *United States v. Sullivan*, 85 F.3d 743, 749-50 (1st Cir. 1996); *United States v. Boyd*, 54 F.3d 868, 871 (D.C. Cir.

1995); *United States v. Richter*, 826 F.2d 206, 208 (2d Cir. 1987); *but see United States v. Williamson*, 53 F.3d 1500, 1523 (10th Cir. 1995) (characterizing as unpersuasive the reasoning set forth in *Richter* as to why such questions should not be allowed but declining to decide the issue). Most of these courts have reasoned that such questions are improper because they invade the province of the jury by forcing defendants to assess the credibility of others who have testified.

We hold that it is improper to ask a testifying defendant whether another witness is lying. We come to this conclusion for several reasons.

First, the Federal Rules of Evidence do not permit such questions. *See United States v. Henderson*, 409 F.3d 1293, 1299 (11th Cir. 2005) ("The Federal Rules of Evidence preclude a witness from testifying as to the credibility of another witness.") While Rule 608(a) permits a witness to testify, in the form of opinion or reputation evidence, that another witness has a general character for truthfulness or untruthfulness, that rule does not permit a witness to testify that another witness was truthful or not on a specific occasion. Moreover, the were-they-lying questions have little or no probative value because they seek an answer beyond the personal knowledge of the witness. *See Harris*, 471 F.3d at 511 (stating that such questions "force a witness to testify as to something he cannot know, *i.e.*, whether another is intentionally seeking to mislead the tribunal"); Fed. R. Evid. 602 ("A witness may

44

not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). The were-they-lying questions are also not relevant because one witness's opinion that another person has or has not lied does not make it more or less likely that the person actually lied. Fed. R. Evid. 401. And, the were-they-lying questions distract the jury from the central task of determining what version of events is accurate in order to determine a defendant's guilt or innocence.

Second, the were-they-lying questions invade the province of the jury, as credibility determinations are to be made by the jury, not the testifying witness. *See Snowden v. Singletary*, 135 F.3d 732, 739 (11th Cir. 1998) ("Witness credibility is the sole province of the jury."); *Thomas*, 453 F.3d at 846 ("Because the evaluation of witness credibility is the province of the jury, it is improper to ask one witness to comment on the veracity of the testimony of another witness.") (internal quotation marks and citation omitted).

Third, the were-they-lying questions ignore other possible explanations for inconsistent testimony. Testimony can conflict for many reasons that do not involve a deliberate intent to deceive. There may be lapses in memory, differences in perception, or a genuine misunderstanding. The were-they-lying questions ignore all of these innocent explanations, and put the testifying defendant in a "no-win"

situation: The defendant must either accuse another witness of lying or undermine his or her own version of events. *See Harris,* 471 F.3d at 511 (stating that such questions unfairly "force defendants into choosing to either undermine their own testimony or essentially accuse another witness of being a liar"); *Liggett v. People*, 135 P.3d 725, 731-32 (Colo. 2006) (citing *State v. Graves*, 668 N.W.2d 860, 872 (Iowa 2003)) (describing the "no-win" situation that results when were-they-lying questions are posed).

Fourth, the were-they-lying questions are argumentative, and often their primary purpose is to make the defendant appear accusatory. *See Liggett*, 135 P.3d at 732 (citing *Burgess v. State*, 495 S.E.2d 445, 447 (S.C. 1998)) (describing were-they-lying questions as argumentative). The very structure of the question is designed to pit the testifying witness against every other adverse witness, suggesting to the jury that someone is deliberately deceiving the court and the jury must choose the culprit. While the jury must make credibility assessments in determining guilt or innocence, the were-they-lying questions do not serve this function but prejudicially force the testifying defendant to accuse or not. Even worse, the defendant's answer often does not matter because the predominate purpose of such questions is to make the defendant look bad. *Graves*, 668 N.W.2d at 872.

Today's holding will not hamper the prosecution's ability to cross-examine a criminal defendant. We recognize that "[i]t is essential . . . to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth." *Harris*, 471 F.3d at 512 (quoting *United States v. Havens*, 446 U.S. 620, 626-27, 100 S. Ct. 1912, 1916 (1980)). We agree that "it is often necessary on cross-examination to focus a witness on the differences and similarities between his testimony and that of another witness. This is permissible provided he is not asked to testify as to the veracity of the other witness." *Harris*, 471 F.3d at 512. We also recognize that were-they-lying questions might be proper "if a defendant opened the door by testifying on direct that another witness was lying." *Harris*, 471 F.3d at 512; *see also Boyd*, 54 F.3d at 871 n.* (explaining that had the defendant "testified on his own that the officers were lying, such questions might be proper"). Thus, while we hold today that asking a criminal defendant whether another witness is lying is improper, we do not foreclose the possibility that, in the circumstances of a particular case, a question about the truthfulness of another witness may in some cases be appropriate.

The Government contends that Schmitz opened the door to such questions in this case by testifying on direct examination as to the truthfulness of another witness. On direct examination, Schmitz testified that Speaker Hammett was not truthful when

he testified that Schmitz asked him to adjust the budget to support her CITY Program employment. According to the Government, this testimony opened the door to the prosecutor's later questions about the truthfulness of other witnesses. We recognize that were-they-lying questions may be proper if a defendant opens the door by testifying on direct that another witness was lying. But Schmitz opened no such door in this case. First, Schmitz did not testify on direct that Hammett was a liar. Second, even if Schmitz's direct testimony could be construed as calling Hammett a liar, the prosecutor did not cross-examine Schmitz only as to Hammett's testimony. Instead, the prosecutor cross-examined Schmitz as to the testimony of eleven other witnesses and forced her to testify whether they were lying. Even if Schmitz opened the door as to Hammett's testimony, eleven other doors remained closed.

With respect to the prosecutor's comments made during closing argument, "an attorney's statements that indicate his opinion or knowledge of the case as theretofore presented before the court and jury are permissible if the attorney makes it clear that the conclusions he is urging are conclusions to be drawn from the evidence." *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984) (quotation omitted). In light of this principle, the propriety of the prosecutor's closing-argument comments presents a closer question than the propriety of the cross-examination questions. We have no doubt that there are some cases where a prosecutor is justified in arguing during

48

closing arguments that a particular witness is lying, if that is an inference supported by the evidence at trial. *See, e.g., Chandler v. Moore*, 240 F.3d 907, 914 (11th Cir. 2001) (finding that prosecutor's comment during closing argument that witness was liar was accurate statement because witness had told four different stories regarding defendant's whereabouts during crucial time). We must nonetheless conclude that the prosecutor's comments in this particular case were not justified. The problem with the prosecutor's comments in this case is that they were a clear continuation of the improper questions posed previously during Schmitz's cross-examination. In particular, the prosecutor continued during closing arguments to hammer home the idea of a "liar list," which was a metaphor improperly developed during Schmitz's cross-examination. Thus, we hold that the comments in closing argument were improper because the cross-examination was improper.

Having concluded that allowing the prosecutor's cross-examination questions and closing-argument comments constituted error, we must decide whether those errors were plain. "Before an error is subject to correction under the plain error rule, it must be plain under controlling precedent or in view of the unequivocally clear words of a statute or rule[.]" *United States v. Lett*, 483 F.3d 782, 790 (11th Cir. 2007) (citing *Olano*, 507 U.S. at 732-37, 113 S. Ct. at 1776-79); *see also United States v. Castro*, 455 F.3d 1249, 1253 (11th Cir. 2006) (quoting *United States v.*

49

*Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003) ("When 'the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it.'"). The Supreme Court has never ruled on the propriety of questions and comments of the kind at issue in this case, and, until now, neither has the Eleventh Circuit. As a result, although Schmitz has shown errors in allowing the prosecutor's questions and comments, she cannot show that such errors were plain, and thus her challenge must fail.[14]

## V. CONCLUSION

Counts Two, Three, and Four charge Schmitz with mail fraud. We affirm her convictions on these counts.

Counts Five, Six, Seven, and Eight charge Schmitz with fraud and other offenses concerning a program receiving federal funds. We vacate Schmitz's convictions on these counts.

---

[14] Because we have determined that the errors in this case were not plain, and all four requirements of the plain error rule must be met for this court to have the authority to correct such errors, we need not address whether the errors affected Schmitz's substantial rights, or whether such errors seriously affected the fairness, integrity or public reputation of the judicial proceedings. *See United States v. Cotton*, 535 U.S. 625, 631-32, 122 S. Ct. 1781, 1785 (2002) (quoting *Olano*, 507 U.S. at 732, 113 S. Ct. 1770, 1776) (noting that all four conditions of plain error rule must be met).

We vacate Schmitz's sentences on all counts and remand for resentencing.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR RESENTENCING.

BLACK, Circuit Judge, concurring in part and dissenting in part:

I join the majority opinion except as to Part IV.A.2. The majority's holding that Counts Five through Eight of the indictment were legally insufficient appears to be based on two separate conclusions: (1) that Counts Five through Eight, standing alone, fail to provide Schmitz with sufficient notice of the charges to be defended against, and (2) that we may not look to the factual allegations of Counts One through Four in assessing whether Schmitz had notice of the charges to be defended against in Counts Five through Eight. Because I disagree with the second conclusion and believe that, read in the context of the indictment as a whole, Counts Five through Eight provide sufficient notice of the charges to be defended against, I dissent from this part of the opinion.

Although Counts One through Four of the indictment describe Schmitz's allegedly fraudulent conduct in detail, the majority concludes that we cannot consider these allegations because it would contradict the principle, articulated in *United States v. Huff*, 512 F.2d 66, 69 (5th Cir. 1975), that "each count of an indictment must be regarded as if it were a separate indictment and must stand on its own content without dependence for its validity on the allegations of any other count not expressly incorporated." As the majority notes, an indictment is valid if it: "(1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to

be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *United States v. Jordan*, 582 F.3d 1239, 1245 (11th Cir. 2009). While the majority interprets *Huff* as imposing a broad rule that we examine counts of an indictment in isolation, I read *Huff*'s holding as addressing only the first of these requirements. That is, *Huff* establishes that the failure to allege an essential element of the offense cannot be cured by looking to other counts of an indictment, but *Huff* does not require that we read counts in isolation when assessing whether an indictment provided sufficient notice of the charges to be defended against.

In *Huff*, the defendant was charged in Count I with the unlawful distribution of "3,4 methylenedioxy amphetamine," a controlled substance. In Count II of the indictment, however, he was charged with possession with intent to distribute "methylenedioxy amphetamine." The defendant argued that Count II was void because the drug "methylenedioxy amphetamine," as distinguished from "3,4 methylenedioxy amphetamine," was not a controlled substance, and the count therefore failed to charge a crime. The prosecution admitted that the substance was misdescribed in Count II, but contended that this count was sufficient when read together with Count I as part of the entire indictment. *Huff*, 512 F.2d at 68-69.

53

The Fifth Circuit reversed the defendant's conviction on Count II. While noting that courts have generally allowed "common sense rather than mere technicalities [to] govern the determination of the sufficiency of an indictment," the court concluded "even a liberal construction of this simple rule does not dispense with the requirement that an indictment or each count thereof *allege all the essential elements of an offense*." *Id.* at 69 (emphasis added). The court explained:

> [E]ach count of an indictment must be regarded as if it were a separate indictment and must stand on its own content without dependence for its validity on the allegations of any other count not expressly incorporated. Here, the challenged count of the indictment *alleges nothing more than an act which is legal*. And *such a failure to allege a crime* cannot be remedied by proof or curative instructions which attempt to incorporate other counts not expressly referred to in the challenged count.

*Id.* (citations omitted) (emphasis added). The court added that it could not regard the defect as a "mere technicality," because "the variance between *non-criminal conduct*, as alleged in Count II, and *criminal conduct*, which the government attempted to prove under Count II, rises above the level of form, however minute the omission may have been." *Id.* (emphasis added).

Given *Huff*'s emphasis on the fact that Count II wholly failed to charge a crime, I do not read *Huff* to establish the broad rule the majority suggests.[1]  Moreover, this Court's direction that we read an indictment "as a whole" and give it a "common sense construction" in determining its validity, *see, e.g.*, *Jordan*, 582 F.3d at 1245, supports this narrower reading of *Huff*.

Considering the indictment as a whole in determining whether a defendant had notice finds support in several of our sister circuits.  For example, the Seventh Circuit, in *United States v. Dooley*, 578 F.3d 582, 590 (7th Cir. 2009), considered a defendant's claim that he lacked notice of the charges against him where one count of the indictment alleged that he "intentionally misapplied property valued at $5,000 or more," but did not describe the property at issue or how it was misapplied.  The court concluded this omission did not render the indictment insufficient because, reading the indictment as a whole, "it is clear that the property described in Count 7

_____

[1] The majority cites cases from several other circuits to support its conclusion that, absent express incorporation, we may not look to factual allegations in other counts of the indictment.  As in *Huff*, however, most of these cases seem to turn on the failure to include an essential element of the offense under the count at issue. *See United States v. Knowles*, 29 F.3d 947, 952 (5th Cir. 1994) (explaining that the failure to allege a nexus to interstate commerce under a count charging a violation of the Gun Free Schools Act "render[ed] that charge fundamentally defective"); *United States v. Miller*, 774 F.2d 883, 883 (8th Cir. 1985) (holding the indictment was insufficient "in that it failed to cite the state statute alleged to have been violated, an essential element of the offense described in 18 U.S.C. section 1955"); *United States v. Fulcher*, 626 F.2d 985, 988 (D.C. Cir. 1980) ("[W]e hold that the false pretenses counts, counts four through eight in the indictment, fail to state an offense.").  Nor did *United States v. Redcorn*, 528 F.3d 727, 734-35 (10th Cir. 2008), involve facts similar to this case; instead the court was addressing a claim of inconsistency within the indictment.

is the cash and the laptop, the misapplication of which are described in detail in the previous counts." *Id.* The Ninth and Tenth Circuits have similarly looked to factual allegations in other counts in considering whether an indictment provided sufficient notice. *See United States v. Normandeau*, 800 F.2d 953, 958 (9th Cir. 1986) *overruled in part on other grounds as stated in United States v. Nordby*, 225 F.3d 1053, 1059 (9th Cir. 2000) (holding that reading the indictment as a whole, "[w]e have no doubt that [the defendant] was fully aware of the charges against him"); *United States v. Staggs*, 881 F.2d 1527, 1531 (10th Cir. 1989) (en banc) (noting that even in the absence of express incorporation, "the allegations in count one afforded appellants actual notice regarding the violations proved at trial").

Additionally, although this Court has not explicitly stated that it is appropriate to consider the factual allegations of other counts in determining notice, our analysis in *United States v. Cox*, 664 F.2d 257, 257-58 (11th Cir. 1981), strongly supports this conclusion. In *Cox*, the defendant claimed that Count Six, charging him with conversion of "property of the United States of the value of about $24,916.82" was too vague to inform him of the nature of the offense charged. This Court concluded that the defendant had not been prejudiced in the preparation of his defense, in part because Count Four of the indictment "clearly described the property and identified

it by the same value, and the property was again described in detail and by the value in Overt Act 13 of Count Four." *Id.* at 258-59.

Such an approach does not mean, as the majority suggests, that "factual allegations in one count are somehow automatically incorporated into other counts." Maj. Op. at 28. Rather, we simply consider whether in reading a particular indictment as a whole and giving it a common sense construction, *see Jordan*, 582 F.3d at 1245, the defendant had notice of the charges to be defended against.

In this case, I must conclude that the federal funds counts provided sufficient notice of the charges to be defended against when read in the context of the indictment as a whole. Contrary to the majority's description of the federal-funds counts as containing "no factual allegations at all . . . regarding the scheme to defraud," Maj. Op. at 29 n.10, Counts Five through Eight allege the approximate dates of the fraud (January 2003 to October 2006), the location (Madison County and elsewhere), the name of the federal program from which the funds were obtained (CITY), the amount stolen ($177,251.82), and the form in which Schmitz obtained this amount (as salary and other benefits). Although these counts lack a description of precisely how the fraud was carried out, the dates, location, program, amount, and form in which the funds were obtained are exactly the same as those alleged in describing the fraudulent scheme detailed in Counts One through Four. On these

57

facts, I am unconvinced that Schmitz lacked notice that the fraudulent conduct underlying Counts Five through Eight was the same scheme described in detail in Counts One through Four.  I would therefore affirm Schmitz's convictions, on all counts.