[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13203

_____

D.C. Docket No. 6:18-cr-00035-GAP-GJK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TANGANICA CORBETT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 17, 2019)

Before WILLIAM PRYOR and NEWSOM, Circuit Judges, and VRATIL,[*] District
Judge.

WILLIAM PRYOR, Circuit Judge:

_____

[*] Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by
designation.

This appeal requires us to review two sentencing enhancements for plain error and to reverse one of them. After Tanganica Corbett pleaded guilty to participation in an identity-fraud conspiracy, the district court enhanced her offense level under the Sentencing Guidelines two levels for an offense involving ten or more victims and ten levels for an offense that caused a loss that exceeds $150,000 but does not exceed $250,000. *See* United States Sentencing Guidelines Manual § 2B1.1(b)(1)(F), (b)(2)(A)(i) (Nov. 2016). Corbett objected to each enhancement in the district court, but on different grounds from her arguments on appeal, so we review each issue for plain error only. We agree with Corbett that the district court committed plain error in its application of the ten-or-more-victims enhancement because, contrary to our precedent, *United States v. Hall*, 704 F.3d 1317 (11th Cir. 2013), the district court counted as a victim any individual whose means of identification was stolen regardless of whether it was "used" as a means of identification. *See* U.S.S.G. § 2B1.1 cmt. n.4(E). But Corbett identifies no plain error in the application of the loss-amount enhancement. We vacate Corbett's sentence and remand with instructions for resentencing.

## I. BACKGROUND

Tanganica Corbett and Kevin Weaver II worked at Florida Hospital near Orlando, Florida. From July 2012 to July 2013, Weaver held the position of release-of-information specialist. During that time, Weaver downloaded patients'

2

"face sheets"—profiles that include a patient's name, health information, date of birth, Social Security number, and insurance details—without the authority to do so. He then sold them to an unidentified co-conspirator who, the government believed, intended to use the information to open credit-card accounts and to commit other forms of identity fraud.

In July 2013, Corbett took over Weaver's position as release-of-information specialist. He solicited her to obtain face sheets without authority and to pass them on to him. She complied. In March 2014, Weaver paid her about $150 to $200 for her assistance.

A grand jury charged Corbett and Weaver with conspiracy to obtain and disclose individually identifiable health information for commercial advantage, personal gain, or malicious harm. *See* 42 U.S.C. § 1320d-6(a)(2)–(3), (b)(3); 18 U.S.C. § 371. The indictment also charged each defendant with two substantive counts of obtaining and disclosing such information. Both defendants pleaded guilty.

Using the 2016 edition of the Sentencing Guidelines Manual, the probation officer assigned Corbett a total offense level of 22 based on a base offense level of 6 and four enhancements, two of which Corbett objects to in this appeal. *See* U.S.S.G. § 2B1.1(a)(2) (prescribing the base offense level). First, the probation officer found that "the defendants," collectively, "unlawfully accessed more than

3

1,700 means of identification," so the probation officer applied the two-level enhancement for an offense that "involved 10 or more victims." *Id.* § 2B1.1(b)(2)(A)(i). Second, the probation officer found that Florida Hospital incurred a loss of $232,068.64 in "costs associated with identifying and notifying patients whose individually identifiable health information was viewed without authorization," so the probation officer applied the ten-level enhancement for a loss amount exceeding $150,000 but not exceeding $250,000. *See id.* § 2B1.1(b)(1)(F). Combining Corbett's total offense level of 22 with a criminal-history category of I based on zero criminal-history points, the probation officer calculated an applicable sentencing range of 41 to 51 months of imprisonment. But the probation officer recommended a variant sentence of 24 months based on Corbett's lack of criminal history and her family responsibilities.

Among other timely objections to the probation officer's Guidelines calculations, Corbett objected to the probation officer's calculation of the loss amount on the ground that it did not limit her relevant conduct as required by section 1B1.3 of the Guidelines. Corbett also objected to the probation officer's failure to apply a three-level reduction for acceptance of responsibility. *See id.* § 3E1.1. But, apart from a stray, unexplained reference in her sentencing brief, Corbett expressed no objection to the ten-or-more-victims enhancement before the sentencing hearing.

4

At the sentencing hearing, Corbett confirmed that she had "no objections to the facts" in the presentence investigation report, but she presented her "legal objections" to the probation officer's calculations under the Guidelines, including her objections to the loss amount and the ten-or-more-victims enhancement. With respect to the loss amount, Corbett did not press her relevant-conduct argument based on section 1B1.3 but instead argued that Florida Hospital's expenses should have been excluded as "costs incurred by victims primarily to aid the government in[] the prosecution and criminal investigation of an offense." *Id.* § 2B1.1 cmt. n.3(D)(ii). The district court replied, "Well, I think more appropriately it was the cost they had to expend to deal with this enormous problem that your client helped create. So that objection's overruled." With respect to the ten-or-more-victims enhancement, Corbett argued that, although 1,700 people had had their information compromised, the government had identified only a handful of people, at most, who had suffered any identifiable financial harm as a result of the conspiracy. The district court overruled that objection, stating, "I think there are a lot more than 10 victims. I think anybody's information who was stolen is a victim." But the district court agreed with Corbett that the acceptance-of-responsibility reduction was warranted, resulting in a total offense level of 19 and a sentencing range of 30 to 37 months.

The district court sentenced Corbett to three concurrent terms of 12 months and one day of imprisonment and three years of supervised release. The district court said that the severity of the offense—"by far the worst" identity-theft case it had ever seen—was "a major aggravating factor." But it found "significant mitigating factors" in that Corbett "up until this event had been a productive person with no criminal conduct," was "clearly less culpable than . . . Weaver," may not have fully understood "that she was doing wrong," was "remorseful," and had "cooperated with the Government." The district court remarked favorably that Corbett had "maintained employment notwithstanding these difficulties," recognized her "family obligations," and deemed her unlikely to reoffend. The district court also took note that Corbett's financial gain was "minuscule." Observing that the probation officer had recommended a variant sentence of 24 months before the acceptance-of-responsibility adjustment had been applied, the district court reasoned, "based on that, the probation officer's recommendation under [the district court's] calculation of the guideline score would be probably closer to 12 to 18 months." The district court stated that, "[u]nder normal circumstances," it might "find probation to be appropriate . . . based on these significant mitigating factors," but that, "[u]nfortunately, that mitigation [was] outweighed by the seriousness of this offense." Corbett maintained her objections to the loss amount and to the ten-or-more-victims enhancement.

6

## II. STANDARDS OF REVIEW

We review Corbett's sentence "under an abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 51 (2007). Corbett does not challenge the substantive reasonableness of her sentence, so we will not vacate the sentence unless the district court committed "significant procedural error, such as . . . improperly calculating[] the Guidelines range." *Id.* "We review a district court's interpretation of the Sentencing Guidelines *de novo,* and the determination of the amount of loss involved in the offense for clear error." *United States v. Maxwell*, 579 F.3d 1282, 1305 (11th Cir. 2009). "When a defendant challenges one of the factual bases of his sentence, the government must prove the disputed fact by a preponderance of the evidence." *United States v. Aguilar-Ibarra*, 740 F.3d 587, 592 (11th Cir. 2014).

We review unpreserved sentencing objections only for plain error. *United States v. Joyner*, 899 F.3d 1199, 1207 (11th Cir. 2018). To establish plain error, "there must be an error that has not been intentionally relinquished or abandoned"; "the error must be plain—that is to say, clear or obvious"; and "the error must have affected the defendant's substantial rights, which in the ordinary case means he or she must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (citation and internal quotation marks omitted). If these conditions are met, we "should exercise [our] discretion to correct the forfeited

7

error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (citation and internal quotation marks omitted). We have explained that, "where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003).

### III. DISCUSSION

We divide our discussion in two parts. First, we explain that the district court plainly erred when it applied the ten-or-more-victims enhancement. Second, we explain that Corbett has established no plain error in the application of the loss-amount enhancement.

#### A. *The District Court Plainly Erred when It Applied the Ten-or-More-Victims Enhancement.*

Section 2B1.1 of the Sentencing Guidelines provides a two-level enhancement for an offense that "involved 10 or more victims." U.S.S.G. § 2B1.1(b)(2)(A)(i). In general, a "victim" is a person who suffered an "actual loss" or an individual who "sustained bodily injury as a result of the offense." *Id.* § 2B1.1 cmt. n.1. But, "in a case involving means of identification," the term "victim" also includes "any individual whose means of identification was used unlawfully or without authority." *Id.* § 2B1.1 cmt. n.4(E). The district court did not find that any victims besides Florida Hospital had suffered an actual loss or that

8

anyone had sustained bodily injury due to the offense, so only the last category of "victims," those "whose means of identification [were] used," is in question.

Based on our decision in *United States v. Hall*, Corbett argues that the district court erred when it counted all 1,700 or more individuals whose face sheets were compromised as victims because the government did not prove that all of their means of identification had been "used" within the meaning of the relevant definition. As a threshold matter, we agree with the government that Corbett did not preserve this objection for appeal and that plain error is the correct standard of review. Corbett's only objection to the ten-or-more-victims enhancement in the district court was that the government had not proved that ten people suffered a financial loss. She made no argument based on *Hall* or on the meaning of the word "used."

But we agree with Corbett that the district court committed plain error. In *Hall*, we considered whether an almost identically situated defendant—a medical office assistant who, like Corbett, stole patients' identifying information and sold it to co-conspirators who in turn sold it to the primary identity fraudsters in the conspiracy—had "used" patients' means of identification. *See* 704 F.3d at 1319. The government argued that Hall "used" every means of identification that she sold or transferred to her co-conspirators. *See id.* at 1319–20. The district court in

9

*Hall* agreed, ruling that "the intentional transfer of information in exchange for consideration constituted actual use." *Id.* at 1320. We rejected that definition.

Based on the plain meaning of the word "used" in the context of the relevant definition of "victim," we held that the "mere sale or transfer" of identifying information was not "equivalent to [its] actual use." *Id.* at 1323. We explained that "'use' is the 'application or employment of something for the purpose for which it is adapted.'" *Id.* at 1322 (alteration adopted) (quoting *Use*, *Black's Law Dictionary* (9th ed. 2009)). We observed the disjunctive use of the words "use" and "transfer" elsewhere in the same section of the Guidelines. *See id.*; *see also* U.S.S.G. § 2B1.1(b)(11)(C)(i) ("the unauthorized transfer or use of any means of identification"). And we observed that another part of the application notes contemplates that a means of identification is "used" when it is employed "to produce or obtain another means of identification." *Hall*, 704 F.3d at 1322; *see* U.S.S.G. § 2B1.1 cmt. n.10(C)(i). We concluded that the only patients whose identifying information had been "used"—and who, as a result, counted as "victims"—were those whose information had been employed to procure fraudulent credit cards, "the purpose of the conspiracy." *Hall*, 704 F.3d at 1322; *see also id.* at 1323. "[T]he plain language of the sentencing guideline at issue," we held, "does not apply to Hall's mere sale or transfer of the patients' identifying

10

information" to her co-conspirators: almost exactly the same conduct for which Corbett was convicted. *Id.* at 1323.

The government's argument for distinguishing *Hall* is untenable. Taking *Hall*'s references to "the purpose of the conspiracy" out of context and treating them as the core of its holding, the government points out that the indictment charged that "the purpose of the conspiracy" between Corbett and Weaver was for them to "unlawfully enrich themselves by . . . stealing . . . and selling the patients' information," not to obtain fraudulent credit cards, and the government argues that Corbett "used" patients' information to that end when she sold it to Weaver. But a similar argument could have been made about the defendant in *Hall*, who, after all, also intended to enrich herself by selling the information she had stolen. Indeed, that argument *was* made, and we rejected it. *See id.* at 1319–20, 1323. Instead, *Hall* held that the "mere sale or transfer" of a means of identification does not constitute its "use," based on the plain meaning of the words and their context. *Id.* at 1323. In other words, *Hall*'s definition of "use" is one that excludes certain *conduct*: "mere sale or transfer." *See United States v. Sammour*, 816 F.3d 1328, 1340 (11th Cir. 2016) ("The word 'used' . . . does not include the 'mere transfer without more.'" (alteration adopted) (quoting *Hall*, 704 F.3d at 1322)).

The government's contrary reading of *Hall* makes little conceptual sense. If "the purpose of the conspiracy" determined whether identical conduct did or did

11

not qualify as "use" of a means of identification, then we would need to know how to define the decisive "purpose." Purposes can be described at varying levels of generality—remote or proximate, abstract or granular—but *Hall* provided no method for selecting the right one. And the proposal on which the government's argument depends—that the sentencing court should simply adopt, *in haec verba*, the description of "the purpose of the conspiracy" in the indictment—has no basis in *Hall* or in logic. The indictment's description of "the purpose of the conspiracy" served a narrative function; it did not recite an element of the offense. So the grand jury was not required to describe Corbett and Weaver's goals at any particular level of generality or with any particular amount of detail. And nothing in *Hall* suggests that the ten-or-more-victims sentencing enhancement depends on the level of generality the grand jury happens to select or the amount of detail it happens to include in its description of a defendant's aims. After all, *Hall* interpreted the word "used" in the context of a definition of "victim" that applies to identity-theft-related crimes. Every reasonable reader of the Guidelines would expect that whether someone counts as a "victim" of such a crime depends on what was *done* with his or her information—that is, on the defendant's conduct.

Although *Hall* explained that the defendant's conduct was *not* the use of means of identification, it made clear what *was* use: the "employ[ment of] that information" to "procure[] . . . fraudulent credit cards and cash advances." *Id.* at

12

1322. "[W]hen the conspirators used . . . 12 patients' identifying information to obtain the fraudulent credit cards," we explained, "[a]t that point, th[ose] 12 individuals . . . became victims." *Id.* at 1322, 1323. To put it simply, we held in *Hall* that a means of identification is "used" for purposes of section 2B1.1 when it is used *as a means of identification*. *See id.* at 1322–23; *see also Smith v. United States*, 508 U.S. 223, 242 (1993) (Scalia, J., dissenting) ("To use an instrumentality ordinarily means to use it for its intended purpose.").

It follows that the district court erred when it counted every individual whose information was illegally downloaded as a "victim," regardless of whether that individual's information was ever fraudulently "used" for any purpose to which it was adapted as a means of identification. And we reject the government's argument that the error was not plain because our opinion in *Hall* left "room for doubt" about the issue. To be sure, when the governing text is unclear about a specific question, "there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *Lejarde-Rada*, 319 F.3d at 1291. But even if the text of the Guidelines were unclear, a question we need not answer, our precedent in *Hall* directly resolves the question whether Corbett's conduct was the "use" of patients' information. That it is possible to misunderstand *Hall*, based on a superficial reading, is irrelevant to what it held.

13

Although we will not correct even a plain error if it does not affect any party's substantial rights, *see* Fed. R. Crim. P. 52(b), the record establishes a reasonable probability that Corbett would have received a different sentence if the district court had not erroneously applied the two-level enhancement for an offense involving ten or more victims. *See Molina-Martinez*, 136 S. Ct. at 1343. To be sure, the district court's significant downward variance from the sentencing range under the Guidelines means that this sentencing error is unusual. The district court calculated that Corbett's sentencing range was 30 to 37 months based on a total offense level of 19 and a criminal-history category of I. If the district court had omitted the two-level enhancement, resulting in a total offense level of 17, Corbett's sentencing range would have been 24 to 30 months. *See* U.S.S.G. ch. 5 pt. A. Corbett's sentence of 12 months and a day falls well below either range, raising a serious question whether the district court's error, however plain, was harmless.

At least in some circumstances, a sentence well below any possible sentencing range can be a powerful indicator that a miscalculated range did not affect a defendant's substantial rights, and the decision in *Molina-Martinez* is not to the contrary. In *Molina-Martinez*, the Supreme Court reasoned that, "[i]n the usual case," "the systemic function of the selected Guidelines range will affect the sentence," so, "[i]n most cases[,] a defendant who has shown that the district court

14

mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome." 136 S. Ct. at 1346. "This is so even if the ultimate sentence falls within both the correct [lower] and incorrect [higher] range." *Id.* at 1345. Even so, "[t]here may be instances when, despite application of an erroneous Guidelines range, a reasonable probability of prejudice does not exist." *Id.* at 1346. The paradigmatic example is when the sentencing judge provides "a detailed explanation of the reasons the selected sentence is appropriate" that "make[s] it clear that the judge based the sentence . . . on factors independent of the Guidelines." *Id.* at 1346–47. But the Court acknowledged that even when "the record is silent as to what the district court might have done had it considered the correct Guidelines range," "unusual circumstances" might prevent an error alone from establishing a reasonable probability of a different outcome. *Id.* at 1347. Ultimately, "a reviewing court must consider the facts and circumstances of the case before it" to determine whether substantial rights were affected. *Id.* at 1346.

We conclude there is a reasonable probability that the district court's error affected Corbett's sentence because, even though the district court varied downward from its calculated sentencing range, its sentencing decision remained tethered to what it believed to be the correct range under the Guidelines. More specifically, its sentencing decision was tethered to the variant sentence that it

15

thought the probation officer, who had originally recommended a 24-month sentence based on a calculated range of 41 to 51 months, would recommend after the district court's application of the acceptance-of-responsibility reduction lowered the range to 30 to 37 months. "[B]ased on that [calculation]," the district court reasoned at the sentencing hearing, "the probation officer's recommendation . . . would be probably closer to 12 to 18 months," and the district court imposed a sentence within that range. On this record, we cannot rule out the reasonable probability that the district court would have imposed a lesser sentence if it had excluded the two-level ten-or-more-victims enhancement, calculated a range of 24 to 30 months, and then estimated the probation officer's recommended variance based on *that* calculation.

The use of the ten-or-more-victims enhancement to calculate Corbett's total offense level was erroneous, the error was plain, and it affected Corbett's substantial rights. "In the ordinary case, proof of a plain Guidelines error that affects the defendant's substantial rights" satisfies the defendant's "burden to persuade the court that the error seriously affected the fairness, integrity or public reputation of judicial proceedings," and the government has not argued that Corbett's case is out of the ordinary in this respect. *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1909 n.4 (2018) (alteration adopted) (citation and internal quotation marks omitted). But, because Corbett did not dispute in the district court

16

how many individuals' means of identification were "used" and presented no factual objections to the probation officer's calculations under the Guidelines, the district court on remand should permit the government the opportunity to introduce new evidence to prove that Corbett's offense involved ten or more victims. *See United States v. Washington*, 714 F.3d 1358, 1362 (11th Cir. 2013).

### B.  Corbett Has Established No Plain Error in the Application of the Loss-Amount Enhancement.

Section 2B1.1 of the Guidelines also provides for a ten-level enhancement if the loss resulting from an offense exceeds $150,000 but does not exceed $250,000. U.S.S.G. § 2B1.1(b)(1)(F). In general, "loss is the greater of actual loss," namely "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss," which "means the pecuniary harm that the defendant purposely sought to inflict." *Id.* § 2B1.1 cmt. n.3(A)–(A)(ii)(I). Pecuniary harm is "harm that is monetary or that otherwise is readily measurable in money," *id.* § 2B1.1 cmt. n.3(A)(iii), and is reasonably foreseeable if "the defendant knew or, under the circumstances, reasonably should have known," that it "was a potential result of the offense," *id.* § 2B1.1 cmt. n.3(A)(iv). "Costs to the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense" are excluded from the calculation of the loss amount. *Id.* § 2B1.1 cmt. n.3(D)(ii). An exact calculation is not required; "[t]he

17

court need only make a reasonable estimate of the loss" "based on available information." *Id.* § 2B1.1 cmt. n.3(C).

Corbett argues that the district court committed significant procedural error in applying this enhancement because it failed to "hold[] the government to its burden of proving a disputed sentencing fact," but Corbett fails to clarify what "sentencing fact" related to the loss amount was "disputed." After all, Corbett expressed "no objection to the facts" of the presentence investigation report. Her objections to the probation officer's calculations under the Guidelines were only "legal objections." And Corbett's argument on appeal confusingly intertwines three distinct rationales for objecting to the enhancement.

First, as the centerpiece of her appellate argument, Corbett appears to contend that Florida Hospital's losses were not "reasonably foreseeable" to her, an argument she never presented in the district court. *See* U.S.S.G. § 2B1.1 cmt. n.3(A)(iv). The probation officer found that, "[a]s a result of Weaver, Corbett and the co-conspirators' conduct, Florida Hospital incurred costs associated with identifying and notifying patients whose individually identifiable health information was viewed without authority by Weaver and his co-conspirators. The loss incurred by Florida Hospital as a result of this conduct is $232,068.64." Because Corbett "did not specifically and clearly object to these factual statements"—or to any of the probation officer's factual findings—"[s]he is

18

deemed to have admitted them and the district court was entitled to rely on them even in the absence of supporting evidence." *Aguilar-Ibarra*, 740 F.3d at 592. In other words, if Corbett intended to raise a factual dispute about how much of the $232,068.64 spent by Florida Hospital was "associated with identifying and notifying patients" whose information was compromised, then she failed to do so, and the government had no burden to prove a fact she had admitted. And if Corbett's argument is that the district court erred as a matter of law by treating "costs associated with identifying and notifying patients" whose information was compromised as "reasonably foreseeable," then she cannot establish plain error. That a hospital will spend resources to investigate and remedy the theft of the identifying and medical information of thousands of its patients is virtually the *definition* of "reasonably foreseeable."

Second, Corbett's argument contains echoes of the objection she raised at the sentencing hearing, that Florida Hospital's losses should have been excluded as "costs incurred . . . primarily to aid the government in[] the prosecution and criminal investigation of an offense." U.S.S.G. § 2B1.1 cmt. n.3(D)(ii). Again, by failing to object to the facts in the presentence investigation report, Corbett admitted that Florida Hospital incurred $232,068.64 in "costs associated with identifying and notifying patients" whose information Weaver and Corbett had compromised, so she placed no burden on the government to prove as a factual

19

matter that any part of that amount was not incurred "primarily to aid the government." And if Corbett's argument is that "costs associated with identifying and notifying patients" are indistinct from costs incurred "primarily to aid the government" as a matter of law, then it fails on its face.

Finally, in a single paragraph of her initial brief, Corbett suggests that she "should not be held responsible for the costs of investigating any data breaches that occurred prior to July 28, 2013," the date she took over Weaver's job as release-of-information specialist. This suggestion corresponds to Corbett's original objection to the loss-amount enhancement: that the probation officer did not limit Corbett's relevant conduct to the acts and omissions for which she was responsible under section 1B1.3 of the Guidelines. *See* U.S.S.G. § 1B1.3 cmt. n.3(B) (explaining, among other principles, that "[a] defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy"); *see also, e.g.*, *United States v. Hunter*, 323 F.3d 1314, 1319–22 (11th Cir. 2003). But Corbett did not pursue this theory at the sentencing hearing, instead pressing the criminal-investigation argument as the basis of her objection to the loss amount, so the district court did not rule on this theory. And Corbett's initial brief fails properly to raise this distinct argument on appeal. Corbett does not cite section 1B1.3, and any hint of an argument based on the Guidelines' definition of

20

relevant conduct is at best "buried within [her] other arguments." *Sapuppo v.*
*Allstate Floridian Ins. Co.*, 739 F.3d 678, 682 (11th Cir. 2014).

We remind the defense bar of the importance of *specific* factual and legal
argumentation at every stage of sentencing proceedings. A defendant should
"specifically and clearly object" to any facts in a presentence report that she does
not intend to admit and that she wishes to require the government to prove by a
preponderance of the evidence. *Aguilar-Ibarra*, 740 F.3d at 592. To preserve an
issue for appeal, a defendant must first present it to the district court, "rais[ing] that
point in such clear and simple language that the trial court may not misunderstand
it." *United States v. Massey*, 443 F.3d 814, 819 (11th Cir. 2006) (quoting *United
States v. Riggs*, 967 F.2d 561, 565 (11th Cir. 1992)). "When the statement is not
clear enough to inform the district court of the legal basis for the objection, . . . the
objection is not properly preserved." *Id.* An issue also is not preserved when its
"factual predicates" are in the record "but were presented to the district court under
a different legal theory." *Id.* And, at the appellate stage, a defendant abandons an
objection to her sentence "when [s]he does not 'plainly and prominently' raise it"
in the argument section of her initial brief, when she "raises it in a perfunctory
manner without supporting arguments and authority," and when she makes only
"passing references" to it that are "background to other arguments or [are] buried
within other arguments, or both." *Sapuppo*, 739 F.3d at 681–82. At this stage too,

21

to present an issue properly for our review, an appellant must make explicit "the legal basis for the objection" and the "legal theory" that supports it. *Massey*, 443 F.3d at 819. Corbett has properly raised no argument establishing plain error in the application of the loss-amount enhancement.

## IV. CONCLUSION

We **VACATE** Corbett's sentence and **REMAND** for resentencing.