[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-10741

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

NADEGE AUGUSTE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:23-cr-60010-WPD-6

_____

2                    Opinion of the Court                    24-10741

_____

No. 24-10757

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

NADEGE AUGUSTE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:23-cr-60175-WPD-1

_____

Before JORDAN, ROSENBAUM, and BRANCH, Circuit Judges.

PER CURIAM:

In these consolidated appeals, Nadege Auguste challenges her convictions for wire fraud and conspiracy to commit wire fraud.  She argues that the government improperly relied on the

"right to control" theory of wire fraud that the Supreme Court rejected in *Ciminelli v. United States*, 598 U.S. 306 (2023), and that the object of the scheme to defraud was not "money or property," as required by the wire fraud statute. *See* 18 U.S.C. § 1343. After careful review, we affirm.

## I.    Background

Auguste's challenged convictions arise from two prosecutions in the district court. This section relays the relevant facts and procedural history from both.

### A.    Indictments

In January 2023, a federal grand jury indicted Auguste and others for conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and wire fraud, in violation of 18 U.S.C. § 1343. The indictment arose out of Auguste and others' participation in a scheme to sell fake nursing diplomas and transcripts to co-conspirators so that the co-conspirators could fraudulently obtain state nursing licenses and, eventually, nursing jobs with unsuspecting health care employers.

The indictment alleged that the defendants, including Auguste, conspired to "unlawfully enrich themselves by, among other things":

> (a) soliciting and recruiting co-conspirators, via interstate wire communications, seeking nursing credentials to obtain employment as an LPN/VN in the health care field; (b) creating and distributing, via interstate wire communications, false and fraudulent

> diplomas and transcripts for co-conspirators seeking LPN/VN licensure and employment in the health care field; (c) using the false and fraudulent documents to obtain employment, pay, and other benefits in the health care field; (d) concealing the use of fraudulent documents used to obtain employment in the health care field; and (e) using the proceeds of the conspiracy for their personal use and benefit.

Specifically, the scheme was alleged to work as follows: Auguste and others first "recruited co-conspirators . . . seeking nursing credentials and employment as an LPN/VN in the health care field." Then, Sacred Heart International Institute Inc. ("Sacred Heart")—a Florida corporation licensed by the Florida Board of Nursing to educate nurses—"create[d] false and fraudulent official transcripts and diplomas" for the recruited co-conspirators. The transcripts and diplomas stated that the recruits had "attended Sacred Heart in Florida and completed the necessary courses and/or clinicals to obtain LPN/VN diplomas, when in fact the [recruits] had never actually completed the necessary courses and/or clinicals." The recruits then used the fraudulent diplomas and transcripts "to obtain licensure as an LPN/VN in various states." Finally, the recruits "used the false and fraudulent diplomas, transcripts and other documents created and distributed by" Auguste and others "to fraudulently obtain employment and benefits as an LPN/VN at various unwitting health care providers throughout the county." "Those health care providers hired and paid salaries, wages, and other benefits to the LPN/VNs based on their fraudulent credentials."

The indictment's substantive wire fraud allegations were substantially the same.  The indictment alleged that the "[p]urpose of the [s]cheme and [a]rtifice" to defraud was for the defendants, including Auguste, to "unlawfully enrich themselves by, among other things," recruiting co-conspirators who wanted to be nurses and selling fraudulent diplomas and transcripts to those co-conspirators so that they could obtain "LPN/VN licensure" and, ultimately, "employment, pay, and other benefit in the health care field."  The indictment again alleged that the co-conspirators "conceal[ed] the use of fraudulent documents used to obtain" the nursing jobs.  And it identified one instance in which a wire was used to send an e-mail "verifying the submission of accomplice nursing applicants to the Florida Board of Nursing as Sacred Heart graduates."

In September 2023, another grand jury indicted Auguste once again for conspiracy to commit wire fraud and wire fraud.  As shown in the government's superseding information, the allegations in this case were substantially the same as the allegations in the first case, except that the second case focused on Auguste's role in securing fraudulent nursing diplomas and transcripts from a Florida LLC named Siena College of Health instead of from Sacred Heart.  Just like in the other case, the government alleged that Auguste and others recruited co-conspirators seeking nursing credentials and created fraudulent Siena diplomas and transcripts for those co-conspirators.  The co-conspirators then used those fraudulent documents "to obtain licensure as an RN or LPN/VN in various states," and ultimately,

to "obtain employment and benefits as an RN or LPN/VN at various unwitting health care providers throughout the country." Overall, the purpose of the conspiracy and the scheme to defraud was for Auguste and her co-conspirators to "unlawfully enrich themselves by, among other things," recruiting aspiring nurses as co-conspirators, providing false and fraudulent diplomas and transcripts to those co-conspirators, "using the false and fraudulent documents to obtain employment, pay, and other benefits in the health care field," "concealing the use of fraudulent documents used to obtain employment in the health care field," and "using the proceeds of the fraud [for] their personal use and benefit, and the use and benefit of others." The government also alleged four uses of a wire to support the four substantive wire fraud counts against Auguste.

Auguste moved to dismiss in both cases, but her motions were denied. As relevant here, the magistrate judge in the first case found, and the district court agreed, that the indictment validly alleged a scheme to defraud "unwitting health care providers . . . of property (i.e., money in the form of salary and benefits)." Similarly, in the second case, the district court held that the superseding information validly alleged that "[t]he healthcare provider employers were deceived into parting with salary and benefits which . . . constitute tangible money or property."

### B.    Trials

Both cases proceeded to bench trials based on stipulated facts.[1]  The stipulated facts from the first case—the one involving Sacred Heart—showed the following.[2]  Auguste, working with others, recruited co-conspirators "seeking nursing credentials and employment as an LPN/VN in the health care field."  She and others arranged for the recruited co-conspirators to receive fraudulent diplomas and transcripts from Sacred Heart, which were used to obtain nursing licenses and "employment and benefits as an LPN/VN at various unwitting health care providers throughout the country."  Indeed, when the employers asked for education verification, the co-conspirator nurses would "contact [Auguste's co-conspirator] and Auguste directly requesting that [they] arrange to have Sacred Heart forward the diplomas and transcripts to the employers."  The health care providers that hired the co-conspirator nurses "attest[ed] that they would not have hired the LPNs with fraudulent diplomas and transcripts from Sacred Heart if they had known that the applicants were not properly credentialed."  And two of Auguste's co-conspirators "attest[ed] that it was clearly understood and foreseeable to all the charged conspirators that the nursing candidates sought Sacred

---

[1] In both cases, Auguste waived her right to a jury trial and her right to have the district court make specific findings of fact under Federal Rule of Criminal Procedure 23(c).

[2] Because Auguste is the only appellant here, we focus on the facts related to her involvement in the scheme.

Heart diplomas and certificates with the intent to obtain employment in health care."

Auguste benefitted from the scheme by receiving a portion of the payments made by the co-conspirators seeking fraudulent diplomas and transcripts. She and her closest co-conspirator "brokered and/or assisted in the purchase and issuance of 93 fraudulent Sacred Heart nursing school diplomas and transcripts used by [the recruited co-conspirator nurses] to obtain employment in the health care field." The co-conspirator nurses paid Auguste and her partner "$16,000 for each fraudulent diploma and transcript," of which Auguste and her co-conspirator retained 25% "for their assistance in the fraud scheme." Overall, Auguste and her co-conspirator "earned a total of approximately $372,000 because of their participation in th[e] scheme."

The facts from the second case—the one involving Siena—were materially similar. Auguste and a co-conspirator recruited aspiring nurses and sold them fraudulent transcripts and diplomas from Siena so that they could obtain nursing certification and employment. Auguste and the co-conspirator helped the co-conspirator nurses supply the fraudulent information to state nursing boards, and they also "assisted the aspiring nurses in satisfying the employment verification requirements by requesting that [Siena] provide proof of their education to the employers." The employers attested that they would not have hired the nurses had they known that the nurses did not actually complete nursing school. And, once again, Auguste's co-conspirators were ready to

testify that it was "clearly understood and foreseeable" that the recruited co-conspirator nurses were participating in the scheme "with the intent to obtain employment in the health care [field]."

Auguste's compensation followed the same pattern as in the first case. She and her partner "brokered and/or assisted in the purchase and issuance of 97 fraudulent Siena nursing school diplomas and transcripts." They charged each co-conspirator nurse $20,000 for the fraudulent documents, of which they retained 25% "as commission for their assistance in the fraud scheme." "Therefore, the total intended loss total[ed] $1,940,000 and Nadege Auguste earned approximately $291,000 because of her participation in th[e] scheme to defraud."

The district court found Auguste guilty of conspiracy to commit wire fraud in the first case, and guilty of conspiracy to commit wire fraud and wire fraud in the second case. The court denied Auguste's motions for judgment of acquittal and a new trial.

Auguste timely appealed.

## II.　　Standard of Review

"We review the district court's denial of a motion to dismiss the indictment for abuse of discretion, but the sufficiency of an indictment is a legal question that we review de novo." *United States v. Bobo*, 344 F.3d 1076, 1082–83 (11th Cir. 2003) (quotation omitted). "We review de novo the sufficiency of the evidence to support a conviction, viewing the evidence in the light most favorable to the verdict . . . ." *United States v. Grow*, 977 F.3d 1310, 1320 (11th Cir. 2020) (quotation omitted).

### III.    Discussion

Auguste advances two main arguments on appeal.[3]   First, she asserts that the government improperly relied on the "right to control" theory of wire fraud the Supreme Court rejected in *Ciminelli v. United States*, 598 U.S. 306 (2023).  Second, she contends that even if the government did not rely on the "right to control" theory, her convictions still fail because the object of her and her co-conspirators' scheme to defraud was not "money or property," as required by the wire fraud statute.  *See* 18 U.S.C. § 1343.  We first examine Auguste's *Ciminelli* argument.   Then, we turn to her "money or property" argument.   Ultimately, we find that both arguments fail.

### A.    *The government did not rely on the "right to control" theory of wire fraud*

"Under the right-to-control theory, a defendant is guilty of wire fraud if [she] schemes to deprive the victim of potentially valuable economic information necessary to make discretionary economic decisions."   *Ciminelli*, 598 U.S. at 308 (quotation omitted).  Auguste asserts that the government relied on the "right to control" theory of wire fraud because the "charging documents" in her cases "alleged that Auguste [and her co-conspirators] had concealed 'the use of fraudulent documents used to obtain

---

[3] Auguste's arguments on appeal are less than clear.  As appropriate, we construe them the best we can.

24-10741              Opinion of the Court                    11

employment in the health care field.'"[4]  That is, Auguste seems to argue that because the government alleged that she and her co-conspirators deprived the health care employers of knowledge of the fact that the co-conspirator nurses had false credentials, the government necessarily relied on the right to control theory of wire fraud.  We disagree.[5]

The wire fraud statute prohibits using interstate wires to engage in "scheme[s] or artifice[s] to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343.  "Although the statute is phrased in the disjunctive," the Supreme Court has interpreted "the 'money or property' requirement to limit the 'scheme or artifice to defraud' element."  *Ciminelli*, 598 U.S. at 312

---

[4] In arguing that the government proceeded under the "right to control" theory, Auguste complains only about the language in the government's charging documents.  She does not argue that the government pursued the "right to control" theory at trial.  Thus, this section focuses only on the charging documents.  *See United States v. Corbett*, 921 F.3d 1032, 1043 (11th Cir. 2019) (explaining that a defendant abandons an issue on appeal when she does not "plainly and prominently raise it in the argument section of her initial brief" (quotation omitted)).

[5] An indictment is legally sufficient if it "(1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense."  *United States v. Schmitz*, 634 F.3d 1247, 1259 (11th Cir. 2011) (quotation omitted).  "[T]he sufficiency of a criminal indictment is determined from its face."  *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006) (quotation omitted).

(citing *Cleveland v. United States*, 531 U.S. 12, 19 (2000)). That is, the wire fraud statute is concerned with "property rights only." *Id.* (citing *Cleveland*, 531 U.S. at 19). Thus, to prove that a defendant committed wire fraud, the government must prove—among other things—that "money or property was 'an object of [the defendant's] fraud.'" *Id.* (quoting *Kelly v. United States*, 590 U.S. 391, 398 (2020)). The only "property" interests that qualify under the statute are those "traditional property interests" that "had 'long been recognized as property' when the wire fraud statute was enacted." *Id.* at 314, 316 (quoting *Carpenter v. United States*, 484 U.S. 19, 26 (1987)). Nontraditional property interests—such as "state or municipal license[s]," *Cleveland*, 531 U.S. at 20, or as explained below, "the right to control one's assets," *Ciminelli*, 598 U.S. at 311 (quotation omitted)—do not qualify for protection under the wire fraud statute.

In *Ciminelli*, the Supreme Court considered whether the "right to control" one's assets, without more, was a traditional property interest protected by the wire fraud statute. *See id.* at 314. In that case, the government charged Ciminelli and others with wire fraud for their role in manipulating the bidding process for development contracts. *Id.* at 309–10. In short, the defendants worked together to develop a scheme whereby Ciminelli "would be (and was) selected as a preferred developer" for the development contracts, leading to Ciminelli securing a $750 million project. *Id.* at 310. The government asserted that the defendants deprived the party that awarded the contract of its "right to control its assets" by "depriv[ing] [the awarding party] of

potentially valuable economic information that it would consider valuable in deciding how to use its assets." *Id.* at 311 (quotation omitted).    In other words, the government argued that by depriving the awarding party of the information that Ciminelli was awarded the contract only because the bidding process had been manipulated, the defendants deprived the awarding party of its "right to control" its assets—*i.e.*, its "property." *See id.*

The Supreme Court rejected this "right to control" theory. The Court explained that "[t]he so-called 'right to control' is not an interest that had 'long been recognized as property' when the wire fraud statute was enacted." *Id.* at 314 (citing *Carpenter*, 484 U.S. at 26).    Indeed, the Court highlighted the lack of authority "establish[ing] 'potentially valuable economic information' as a traditionally recognized property interest." *Id.*  To be sure, though, the Court made clear that the government in *Ciminelli* relied exclusively on the "right to control" theory. *See id.* at 310 n.1 (explaining that even though an earlier indictment had alleged that the awarded contracts were the "property at issue," the government relied exclusively on the "right to control" theory in defending against the motion to dismiss the indictment, and the trial court did the same in denying the motion to dismiss).  The Court did not opine on whether the conviction could have stood had the government identified the awarded contract as the "property at issue." *See id.*; *see also id.* at 317–18 (Alito, J., concurring) ("I do not understand the Court's opinion to address . . . the Government's ability to retry [Ciminelli] on the

theory that he conspired to obtain, and did in fact obtain, a traditional form of property, viz., valuable contracts.").

Auguste argues that the Supreme Court's *Ciminelli* decision dooms her convictions because, just as the defendants in *Ciminelli* hid information from the party that awarded Ciminelli the contract, here, the government alleged that Auguste and her co-conspirators concealed from the health care employers "'the use of fraudulent documents used to obtain employment in the health care field.'" Auguste's argument fails.

In both cases below, the government alleged that Auguste and her co-conspirators used the fraudulent diplomas and transcripts to obtain specific property—"employment, pay, and other benefits in the health care field." And in its responses to Auguste's motions to dismiss, the government made clear that the "money or property" at issue was not any "right to control," but rather the health care employers' "money and property in the form of wages and benefits they paid the fake nurses whom they employed under false pretenses." Because the government identified the co-conspirators' wages and benefits as the "property at issue," *contrast Ciminelli*, 598 U.S. at 310 n.1, Auguste's argument that this case is like *Ciminelli* is unfounded.[6]

---

[6] Auguste's reliance on *United States v. Colletti*, 84 M.J. 594 (N-M Ct. Crim. App. 2024) is likewise misplaced—not only because that case does not bind us, but also because it is materially distinguishable. In *Colletti*, the U.S. Navy-Marine Corps Court of Criminal Appeals rejected the government's theory that the "property" at issue was "the exclusive use over [the victims'] intangible property—the sexually explicit depictions of their bodies in digital

Auguste resists this conclusion by pointing out that the charging documents "alleged that [she and her co-conspirators] had concealed 'the use of fraudulent documents used to obtain employment in the health care field.'"  Boiled down, Auguste's theory is that any time the government alleges that a defendant hid information from a defrauded party, the government alleges a "right to control" theory.  That argument is untenable.

The wire fraud statute requires participation in a scheme to defraud.  *See* 18 U.S.C. § 1343.  And we have explained that "[a] scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." *United States v. Estepa*, 998 F.3d 898, 908 (11th Cir. 2021) (quotation omitted).  In other words, to be convicted of wire fraud, a defendant must hide *some* information from the fraud's victim.  To say, as Auguste does, that an allegation that a defendant hid information from a fraud victim converts the government's case into an impermissible "right to control" case would render all wire fraud prosecutions invalid.  The Supreme Court in *Ciminelli* did not mandate such a result.

Because the government adequately alleged the deprivation of something other than the "right to control"—*i.e.*, the specific property of wages and benefits paid out by the health care employers—*Ciminelli* does not apply.  *Ciminelli*, 598 U.S. at 310 &

photographs." *Id*. at 598.  The "exclusive use" theory of property in *Colletti* is nothing like the wages and benefits that the government identifies as "property" here.

n.1 (invalidating Ciminelli's conviction because "the Government's indictment and trial strategy rested *solely* on" the "right to control" theory (emphasis added)).  Having rejected Auguste's "right to control" argument, we now consider whether the government adequately alleged and proved that the object of the scheme to defraud was "money or property," as required under the wire fraud statute.  *See* 18 U.S.C. § 1343.

> B.    *The government adequately alleged and proved that the object of the scheme to defraud was "money or property"*

In addition to her "right to control" argument, Auguste advances two more reasons for setting aside her convictions.  First, she argues that the wages and benefits paid by the health care employers to the co-conspirator nurses are not "money or property" as that phrase is used in the wire fraud statute.  Second, she argues that the wages and benefits paid by the health care employers were "'incidental' to, and *not* the objects of, Auguste's scheme."  On this score, Auguste contends that the elements of wire fraud were not met because "[t]he salaries and employee benefits which were eventually received by the aspirants who obtained nursing licenses did not redound to Auguste's pecuniary benefit."  We reject each of these arguments.

First, here, the wages and benefits paid by the health care employers to the co-conspirator nurses were "money or property," as that phrase is used in the wire fraud statute.  *See* 18 U.S.C. § 1343. Case law shows that, contrary to Auguste's assertions, there is no per se rule that wages or benefits obtained from employment can

24-10741               Opinion of the Court               17

never be "money or property" for purposes of the federal fraud statutes. In *Schmitz*, we affirmed a mail fraud[7] conviction premised on the defendant's "scheme to defraud [the victim] of $177,251.82 *in salary and other benefits*." 634 F.3d at 1260 (emphasis added). And other circuits have explicitly held that wages and benefits can be "money or property" for purposes of the federal fraud statutes. *See, e.g.*, *United States v. Sorich*, 523 F.3d 702, 713 (7th Cir. 2008) ("[W]e hold that jobs are property for purposes of mail fraud."); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990) (holding that bus driver's wages were "money or property" for purposes of mail fraud, explaining that "[m]oney is money, and '*money*' is specifically mentioned in the statutory words"); *United States v. Doherty*, 867 F.2d 47, 56 (1st Cir. 1989) (Breyer, J.) (holding that the "benefits of [an] appointment or promotion" within police departments, including "the salary or increased salary by reason of [such] appointment . . . or promotion," were "money or property" for purposes of mail fraud).[8]

---

[7] That the scheme in *Schmitz* involved mail fraud instead of wire fraud is immaterial. For "[a]side from the means by which a fraud is effectuated, the elements of mail fraud and wire fraud are identical." *United States v. Watkins*, 42 F.4th 1278, 1284 (11th Cir. 2022) (quotation and citations omitted).

[8] To be sure, courts have held that a defendant does not defraud an employer of "money or property" where, generally speaking, the employer receives the benefit of the bargain of its employment relationship with the defendant. *See, e.g.*, *United States v. Guertin*, 67 F.4th 445, 451 (D.C. Cir. 2023) (rejecting the theory that "whenever an employee lies about a specific, concrete condition of employment—here, Guertin's suitability for security clearance—the employer is defrauded of 'money or property' by paying the employee's

Second, Auguste's contention that the wages and benefits received by the co-conspirator nurses "were 'incidental' to, and *not* the objects of, Auguste's scheme" also fails.

The Supreme Court has held that where the deprivation of money or property is an incidental byproduct of a defendant's scheme to defraud, and not an *object* of that scheme, the wire fraud statute does not come into play. *See Kelly*, 590 U.S. at 398. In *Kelly*, the public official defendants ordered the closure of toll lanes on the George Washington Bridge to "punish the mayor of Fort Lee for refusing to support the New Jersey Governor's reelection bid." *Id*. at 393–97. The federal government charged the defendants with wire fraud, arguing that the time and labor associated with the

---

salary"). Courts have also distinguished between *obtaining* a salary through fraud, on one hand, and *maintaining* a salary through fraud, on the other, with the former being covered by the fraud statutes and the latter not. *See, e.g.*, *United States v. Yates*, 16 F.4th 256, 266 (9th Cir. 2021) ("[T]here is a difference between a scheme whose object is to obtain a new or higher salary"—which is prohibited by the federal fraud statutes—"and a scheme whose object is to deceive an employer while continuing to draw an existing salary"—which is not.).

That said, we need not address these nuances here because Auguste argues neither that the health care employers received the benefit of the bargain when they hired the co-conspirator nurses, nor that the co-conspirator nurses somehow sought to maintain, rather than obtain, the wages and benefits paid to them. Instead, Auguste argues at best that employment wages and benefits cannot be "money or property" at all. But as explained above, that is not the law. *See Schmitz*, 634 F.3d at 1260 (affirming mail fraud conviction where "salary and other benefits" were the "money or property" at issue).

implementation of the defendants' lane closure constituted the "money or property" that was the object of the defendants' scheme. *See id.* at 399–400. The Supreme Court rejected the government's theory, holding that the object of the defendants' fraud was to impede access to the George Washington Bridge, not to obtain money or property in the form of time and labor. *Id.* at 403. "The cost of the employee hours spent on implementing th[e] plan was its incidental byproduct." *Id.*

Auguste analogizes to *Kelly* to argue that the health care employers' paid wages and benefits were merely incidental to, and not the objects of, Auguste and her co-conspirators' scheme to defraud. We disagree.

Here, the charging documents explicitly alleged that a "[p]urpose of the [s]cheme[s] and [a]rtifice[s]" to defraud was to "us[e] the false and fraudulent documents [obtained from the educational institutions and state licensing agencies] to obtain employment, pay, and other benefits in the health care field." And the parties' trial stipulations established that Auguste's co-conspirators were prepared to testify that "it was clearly understood and foreseeable to all the charged conspirators that the nursing candidates sought [the fraudulent] diplomas and certificates *with the intent to obtain employment in the health care field*." (emphasis added). Indeed, in both cases, Auguste herself assisted with "forward[ing] [fraudulent] diplomas and transcripts to the [defrauded] employers." Based on these stipulated facts, a reasonable factfinder could find that an object of the overall

scheme was to obtain through fraud the wages and benefits paid out by the health care employers.

In arguing otherwise, Auguste emphasizes that she benefitted only by receiving the co-conspirator nurses' up-front payments for the fraudulent diplomas and transcripts, and that the "salaries and employee benefits which were eventually received by the aspirants who obtained nursing licenses did not redound to [her] pecuniary benefit." Essentially, Auguste argues that because she did not directly receive the fraud victims' money or property, the wire fraud statute does not criminalize her otherwise material participation in the larger scheme to defraud.

We reject this argument. Receiving a financial benefit from a scheme to defraud is not an element of wire fraud. *See United States v. Williams*, 527 F.3d 1235, 1245 (11th Cir. 2008) ("Wire fraud does not require the government to prove . . . that the defendant benefitted from her scheme."). And even if it were, Auguste's argument would still fail. We have explained that all that is required for a wire fraud conviction is that the "defendant knowingly and willfully join[] the criminal scheme, and a co-schemer use[] the [wires] for the purpose of executing the scheme." *United States v. Ward*, 486 F.3d 1212, 1222 (11th Cir. 2007). The defendant need not "personally commit each element" of the offense. *Id.* The same goes for conspiracy to commit wire fraud. *See United States v. Chalker*, 966 F.3d 1177, 1189 (11th Cir. 2020) ("[A] member of a conspiracy is criminally liable for the reasonable foreseeable crimes that other conspirators commit during the

course of and in furtherance of the conspiracy." (quotation omitted)). Thus, even if personally benefitting from the fraud were an element of the wire fraud offense, that would not doom Auguste's convictions here because the government did not have to prove that Auguste personally committed each element. *See Ward*, 486 F.3d at 1222. Her knowing and willful participation in the overall scheme along with a co-schemer's use of the wires was enough for criminal liability. *See id.* And notably, Auguste makes no argument that she did not knowingly and willfully engage in a scheme to defraud or that the wires were not used to further the scheme.

We therefore find that the object of the schemes to defraud alleged and proven in both cases was "money or property," as required by wire fraud statute. *See* 18 U.S.C. § 1343.[9]

### IV.    Conclusion

For these reasons, we affirm Auguste's convictions. **AFFIRMED.**

---

[9] Auguste cites *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017) twice in her brief—once in a footnote in her statement regarding oral argument, and another time in her statement of the case. But Auguste makes no argument that her prosecution here violated *Berroa*'s holding that the fraud must be "the mechanism naturally inducing [the fraud victims] to part with money." 856 F.3d at 149–50 (alteration adopted and quotation omitted). She has therefore abandoned any *Berroa*-based argument. *See Corbett*, 921 F.3d at 1043 (explaining that a defendant abandons an issue on appeal when she does not "plainly and prominently raise it in the argument section of her initial brief" (quotation omitted)).